**Janet SANTANA, et al., Plaintiffs**

v.

**Governor Sila M. CALDERON, et al., Defendants**

**No. CIV. 01–1576(JP).**

United States District Court, D. Puerto Rico.

Feb. 14, 2002.

Andrés Guillemard–Noble, Esq., Nachman, Guillemard & Rebollo, San Juan, PR, for Plaintiff.

María J. Surillo, Commonwealth Department of Justice, Federal Litigation Division, San Juan, PR, Celina Romany Siaca, San Juan, PR, Fidel A. Sevillano del Río, Esq., U.S. Attorney's Office, District of P.R., Civil Division, Hato Rey, PR, for Defendants.

### *OPINION AND ORDER*

PIERAS, Senior District Judge.

## I. INTRODUCTION

The Court has before it Co–Defendants Governor Sila María Calderón, Xavier González (González) and Víctor Rivera Hernández's ("Hernández") Motion To Dismiss Amended Complaint (docket No. 45)[1]. Plaintiffs Janet Santana ("Santana") and her husband, Esteban Pérez bring this action against Defendants under 42 U.S.C. § 1983 and the corresponding laws of the Commonwealth of Puerto Rico, seeking injunctive relief and compensatory and punitive damages, alleging that Defen-

---

1. On January 10, 2002 Co–Defendant Víctor Rivera Hernández moved this Court to allow him to join this motion. The Court hereby GRANTS IN PART Co–Defendant Hernández' Motion and incorporates his name accordingly.

dants politically discriminated against her and created a hostile working environment which culminated in her dismissal from her position of Executive Director of the Human Resources and Occupational Development Council ("HRDOC").

## II. PLAINTIFFS' ALLEGATIONS

Plaintiffs allege the following:

1. That Plaintiff Santana (Santana) began working as a public servant in 1994 at the Puerto Rico Department of Education as an Executive Director where she created and directed the Puerto Rico Goals 2000 Program. The United States Department of Education gave her a cash award for her performance and she was commended for her efforts in the Goals 2000 program, by the then Secretary of the United States Department of Education, Richard Riley. Additionally she administered and managed a budget of $38 million dollars and represented the Secretary of Education with the federal government.

2. That in 1995 Plaintiff Santana was named Assistant Secretary for Federal Affairs for Puerto Rico Department of Education where among other duties, she acted as a liaison between the Puerto Rico Department of Education and the U.S. Department of Education, the Puerto Rico Federal Affairs Office in Washington, D.C. and other Federal Governmental Agencies. She also administered an annual budget of $600 million dollars consisting of federal funds.

3. That From January 1997 until July 2000, Plaintiff Santana worked at the Office of the Governor of Puerto Rico as an Advisor to the Governor on Federal Affairs.

4. That Plaintiff Santana was appointed as a member of the Workforce Investment Board (WIB) in May 2000 and is presently still a member of the WIB.

5. That in July 2000, Plaintiff Santana was appointed as the Executive Director of the Human Resources Occupational Development Council (HRODC) by then Governor Pedro Rosselló and was confirmed by the Senate of Puerto Rico for a four-year term which was to expire in July 2004. Her confirmation as Executive Director of the HRODC during the Senate proceedings was by a unanimous vote of the committee of the Appointing Commission of the Puerto Rico Senate.

6. That the HRODC is the depository and administrator of a $300 million dollar annual budget composed solely of federal funds.

7. That as Executive Director, Plaintiff Santana received proposals or plans from each of the 15 regional or local boards. She reviewed each proposal to ensure it complied with the Puerto Rico WIB's pre-established five year plan. Once she reviewed a proposal she would submit it to the Puerto Rico WIB for their approval. She also was responsible for reviewing each regional board's monthly application for funds. She would determine if the application complied with all pre-established federal and commonwealth regulations. As Executive Director, Plaintiff Santana was responsible for auditing the 15 regional boards for accountability and compliance with all pre-established federal and state regulations. She monitored technical assistance to local boards and one stop centers, monitored Carl D. Perkins and Welfare to Work funding allocated to the Departments of Education and the Family and finally, was responsible for training the regional boards on administrative and management issues in compliance with federal and state rules and regulations.

8. That as Executive Director of the HRODC, Plaintiff Santana did not create or establish any policies or laws and adhered to the pre-established federal and commonwealth laws and regulations.

9. That Plaintiff Santana was well qualified to be appointed Executive Director of the HRODC. She had served as a public servant for the prior seven (7) years during which she received several commendations and recognitions for her excellent service.

10. That Plaintiff Santana performed her duties as Executive Director of the HRODC with the utmost professionalism, responsibility and dedication. On January 31, 2001, Marilyn Shae, Regional Administrator of the United States Department of Labor, wrote a letter to the Defendant Secretary of Labor commending the work done during the previous year by the HRODC. Said letter was copied to Santana. Prior to her dismissal, Plaintiff Santana never received any complaints regarding her performance as Executive Director.

11. That on January 2001, Defendant Governor Sila Calderón was sworn in to the governorship and afterwards selected the new agency directors. As part of this selection process, Defendant Governor Calderón selected as the new Secretary of Labor and Human Resources Co–Defendant Víctor Rivera, Esq. ("Rivera").

12. That Co–Defendant Rivera holds a trust position and is an active member of the Popular Democratic Party ("PDP"). Upon information and belief, Co–Defendant Rivera, as well as Co–Defendant Ralph Muñiz ("Muñiz"), actively participated in fund raising activities for Governor Calderón's political campaign. Co–Defendant Rivera was part of the central committee of the PDP and was employed by the Municipality of San Juan while Governor Calderón was its mayor.

13. That all the Defendants either indifferently acquiesced or actively participated in concert among themselves and with other yet unidentified persons in a plan and/or conspiracy to assign Co–Defendant Rivera to engage in a spurious audit of Plaintiff Santana's actions as Executive Director, to be used as grounds by Co–Defendant Governor Calderón to eliminate Plaintiff Santana from her term position solely because she did not belong to the PDP.

14. That Plaintiff Santana is a known member and follower of the New Progressive Party (NPP).

15. That after the November 2000 elections were held, and Co–Defendant Governor Calderón won the governorship, Plaintiff Santana began receiving sporadic anonymous letters. Additionally, immediately after Co–Defendant Rivera was named and began working as Secretary of Labor and Human Resources, Plaintiff Santana was subjected to an intense persecution and harassment campaign for her political affiliation as member of the NPP. She received anonymous letters on a weekly basis and received harassing telephone calls on a daily basis.

16. That as part of this campaign, career position employees at the HRODC, including but not limited to Co–Defendant Muñiz, continuously made remarks about Plaintiff Santana's imminent dismissal, as a result of her political affiliation. She received multiple harassing calls to her home and to her office, she constantly received harassing and insulting letters stating that her days were numbered, that she and her "batatal" were going to be dismissed and were not going anywhere and that Defendant González Calderón was to be named to

her position. The constant harassment to which Plaintiff Santana was submitted reached its climax when, on February 26, 2001, Plaintiff Santana received a voodoo doll with pins all over and a copy of her signature pinned to the doll's chest. This event was covered by the local press on February 27, 2001 and was reported by Plaintiff Santana to the State police and the FBI.

17. That as part of the intense persecution and harassment which Plaintiff Santana endured, Co–Defendant Muñiz purposely and intentionally misinformed and withheld information from Plaintiff Santana regarding several financial reports that had to be filed with the Federal Government. He caused the untimely filing of the reports and denied having knowledge of the outstanding reports. Co–Defendant Muñiz is and was at all times pertinent hereto the federal contact in Puerto Rico with the HRODC who has to provide, among other things, technical assistance on all levels and has to be informed at all times by the federal government of every aspect regarding the Puerto Rico office.

18. That Plaintiff Santana and her team of co-workers filed all the reports on time directly with the federal government and Co–Defendant Muñiz was irritated by the fact that the reports had been sent without him having seen them first.

19. That in addition to the above mentioned, Co–Defendant Muñiz constantly met with Co–Defendant González Calderón at the Department of Labor to discuss the status of the HRODC and met with personnel from the HRODC without Plaintiff Santana's knowledge or consent.

20. That Co–Defendant González Calderón had been the Regional Director of the Carolina–Trujillo Alto Consortium of the Workforce Investment Act ("WIA") and once Governor Calderón won the elections held on November 2000, Co–Defendant González Calderón was named Auxiliary Secretary of Planning and Special Assistant of Federal Affairs for the WIB.

21. That on more than one occasion, Co–Defendant González Calderón went to the HRODC's offices to obtain information directly from Plaintiff Santana's staff regarding the regional boards or consortiums and asked them to send letters criticizing Plaintiff Santana's job performance.

22. That on March 1, 2001, Plaintiff Santana sent a letter to Defendant Secretary Rivera regarding the pattern of discrimination and harassment she and her employees were being subjected to because of their political beliefs.

23. That on March 2, 2001, Defendant Secretary Rivera sent a letter to Plaintiff Santana denying a training trip requested on February 15, 2001 by Plaintiff Santana, and stated to her that they would meet the following week. No mention of Plaintiff Santana's March 1, 2001 letter was ever made. Following this event, Plaintiff Santana received another anonymous letter stating that she had been taken off the plane ("te bajaron del avión") and that she should get through her coconut head ("cabeza de coco") that she was not going anywhere, not even Culebra.

24. That on March 9, 2001, at 3:00 p.m., a group of six people went to Plaintiff Santana's office, four of which were employees of the Department of Labor and Human Resources. The remaining two were Angel Pacheco, who falsely identified himself as a Police Agent and a locksmith, who immediately began changing the locks of Plaintiff Santana's office. Plaintiff Santana was given a

letter signed by Defendant Governor Calderón, dated March 7, 2001, ordering the immediate termination of her employment as the Executive Director of the HRODC. The letter included various allegations as the cause for her dismissal.

25. That Plaintiff Santana was given fifteen minutes to abandon her office as part of the housing project operative ("operativo de residencial"), as described by Nitza Jiménez, Esq. Attorney Jiménez is and was at all pertinent times hereto, the Management Auxiliary Secretary of the Department of Labor and Human Resources, and was present at all times during the "operative".

26. That as soon as Plaintiff Santana was given her letter of termination, two of the employees of the Department of Labor met with the career employees of the HRODC to inform them of Plaintiff Santana's termination and to give them instructions on how to proceed.

27. That Plaintiff Santana requested to have a meeting with all her employees and after said meeting, Luis Piñot, Esq., Auxiliary Secretary of the Legal Department of the Department of Labor, told them to leave "since their day had culminated," to which they responded they were staying in order to help Plaintiff Santana.

28. That before leaving, Plaintiff Santana reviewed all her outstanding documents and packed her belongings, a task difficult to perform since all the career employees were standing in the hallway screaming insults and making fun of the situation. Two of the persons who came to her office to dismiss her, including the alleged Agent Angel Pacheco, were standing so closely behind her that their bodies touched Plaintiff Santana's back. These two people were watching closely every move made and document read by Plaintiff Santana.

29. That at around 5:00 p.m. a reporter from a radio station came to interview Mrs. Santana and the employees of the Department of Labor tried to impede the interview by pulling the reporter's arm, denying him access and by Attorney Piñot stating that no one was to give any statements to the press. However, Plaintiff Santana was able to express herself.

30. That later the same day, Co–Defendant Rivera made several declarations to the press stating the alleged reasons for the dismissal of Plaintiff Santana. The assertions were untrue and were defamatory.

31. That Defendant Rivera further stigmatized Plaintiff Santana by making further false claims to the press concerning Plaintiffs actions while she was the Executive Director for the HRODC.

32. That the press coverage was damaging to Plaintiff Santana's reputation, by holding her up to public contempt and ridicule. In reaction to these published remarks, Plaintiff Santana distributed a press release refuting the alleged reasons for her dismissal.

33. That during the alleged "housing project operative", Plaintiff Janet Santana was never given the opportunity to be heard by Defendants or defend herself from the alleged reasons for her termination. She was given the letter of termination and was told to gather her belongings and leave.

## III. LEGAL STANDARD FOR A MOTION TO DISMISS

Under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a party may, in response to an initial pleading, file a motion to dismiss the complaint for failure to state a claim upon which relief can be

granted. It is well-settled, however, that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957); *see also Miranda v. Ponce Fed. Bank*, 948 F.2d 41 (1st Cir.1991). The Court must accept as true "all well-pleaded factual averments and indulg[e] all reasonable inferences in the plaintiff's favor." *Aulson v. Blanchard*, 83 F.3d 1, 3 (1st Cir.1996) (citations omitted); *see also Berríos v. Bristol Myers Squibb Caribbean Corp.*, 51 F.Supp.2d 61 (D.Puerto Rico 1999) (Pieras, J.). A complaint must set forth "factual allegations, either direct or inferential, regarding each material element necessary to sustain recovery under some actionable theory." *Romero–Barceló v. Hernández–Agosto*, 75 F.3d 23, 28 n. 2 (1st Cir.1996) (quoting *Gooley v. Mobil Oil Corp.*, 851 F.2d 513, 514 (1st Cir.1988)). The Court, however, need not accept a complaint's " 'bald assertions' or legal conclusions" when assessing a motion to dismiss. *Abbott, III v. United States*, 144 F.3d 1, 2 (1st Cir.1998) (citing *Shaw v. Digital Equip. Corp.*, 82 F.3d 1194, 1216 (1st Cir.1996)). It is with this framework in mind that this Court will assess the instant motion.

## IV. DISCUSSION

In the current litigation Plaintiffs claim that Santana's dismissal was politically motivated; that the dismissal violated her first amendment right of free speech; that the Defendants conspired against her in order to terminate her employment illegal-ly; and that she was denied due process by being terminated from her position, which was for a set term, without the benefit of a pre-termination hearing. Defendants, in turn, move to dismiss the current litigation for the following reasons: that Santana's position as Executive Director of the HRODC is a trust position and that political affiliation is a justifiable ground for dismissal in the interest of public policy; that Plaintiff Santana did not have a property interest in her position and therefore could not have been deprived of her right to due process; that Plaintiffs have not demonstrated that Mr. Xavier González Calderón had any personal involvement in the alleged violations; that the allegations fail to state a claim for conspiracy under either 42 U.S.C. §§ 1983 or 1985(3); that the appearing Defendants are entitled to qualified immunity and finally that Plaintiff Esteban Pérez lacks standing to bring this suit. Each of these arguments shall be addressed in turn.

### A. SECTION 1983

Section 1983 provides for injunctive relief and the recovery of damages against individuals and governmental entities that deprive a plaintiff of rights, privileges, or immunities secured by the Constitution and laws of the United States.[2] The U.S. Supreme Court has "repeatedly held that the coverage of section 1983 must be broadly construed." *Dennis v. Higgins*, 498 U.S. 439, 443, 111 S.Ct. 865, 868, 112 L.Ed.2d 969 (1991) (quoting *Golden State Transit Corp. v. Los Angeles*, 493 U.S. 103, 105, 110 S.Ct. 444, 448, 107 L.Ed.2d 420 (1989)). A broad construction is consistent

2. 42 U.S.C. § 1983 provides, in relevant part: Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to any deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

with the legislative history of section 1983, which was enacted as a remedial measure. *See id.* (citing *Monell v. New York City Dept. of Social Services,* 436 U.S. 658, 684, 98 S.Ct. 2018, 2032, 56 L.Ed.2d 611 (1978)).

In order to establish a prima facie cause of action under Section 1983, Plaintiffs must prove that Defendants' conduct deprived Plaintiff Santana of a constitutional right. *See Parratt v. Taylor,* 451 U.S. 527, 535, 101 S.Ct. 1908, 1912, 68 L.Ed.2d 420 (1981) (overruled in part on other grounds; *Daniels v. Williams,* 474 U.S. 327, 330–331, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986)). An analysis of this issue requires the Court to consider both whether a substantive constitutional violation occurred, and whether Defendants' conduct was the cause in fact of Santana's constitutional deprivation.

## B. Political Discrimination

■ In a case of political discrimination, a plaintiff first must demonstrate that party affiliation was a substantial or motivating factor for the challenged action[3]. *See Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977); *Ortiz–Piñero v. Rivera–Arroyo,* 84 F.3d 7, 11–12 (1st Cir.1996); *Jirau–Bernal v. Agrait,* 37 F.3d 1, 3 (1st Cir.1994). If a plaintiff puts forth the first showing, a defendant must then rebut the same by demonstrating that

3. Defendants do not argue that Santana was not terminated for political reasons but rather that her position is a trust position thus making political affiliation a valid reason for termination. Therefore, for purposes of this opinion, it is unnecessary to address whether Plaintiffs have demonstrated that party affiliation was a motivating factor as Defendants acquiesce the point.

4. The Court notes that the Supreme Court of Puerto Rico has utilized the *Branti/Elrod* analysis, as well, in determining the validity of a dismissal based upon political affiliation. *See*

either there was a nondiscriminatory reason for the dismissal, *see Ortiz–Piñero,* 84 F.3d at 11–12; *Ferrer v. Zayas,* 914 F.2d 309, 311 (1st Cir.1990), or that plaintiff held a "political" or "trust" position for which party affiliation constituted an appropriate qualification for continued employment, *see Branti v. Finkel,* 445 U.S. 507, 518, 100 S.Ct. 1287, 1294–95, 63 L.Ed.2d 574 (1980); *Elrod v. Burns,* 427 U.S. 347, 367, 96 S.Ct. 2673, 2687, 49 L.Ed.2d 547 (1976); *De Choudens v. Government Dev. Bank of P.R.,* 801 F.2d 5, 8 (1st Cir.1986), *cert. denied,* 481 U.S. 1013, 107 S.Ct. 1886, 95 L.Ed.2d 494 (1987).[4]

■ The First Circuit, under the *Branti/Elrod* analysis, implements a two-part inquiry to determine whether a position is political. *See Ortiz–Piñero,* 84 F.3d at 12.

First, we inquire whether the overall functions of the employee's department or agency involve "decision making on issues where there is room for political disagreement on goals or their implementation." Second, we decide whether the particular responsibilities of the plaintiff's position, within the department or agency, resemble those of "a policymaker, privy to confidential information, a communicator, or some other office holder whose function is such that party affiliation is an equally appropriate requirement" for continued tenure.

*Ramos Villanueva v. Cintrón,* 1982 WL 210633, 112 D.P.R. 514 (1982). Upon reading the extensive dissent, so eloquently penned by Judge Díaz Cruz, the Court is convinced that the arguments presented by both the majority and the dissent had been the subject of great discussion before the majority opinion was entered. *Id.* at 520, 1982 WL 210633. With this in mind, the Court follows the majority opinion and in doing so is assured that its own analysis is appropriate for a position within the government of Puerto Rico.

Among the indicia material to the second element are " 'relative pay, technical competence, power to control others, authority to speak in the name of policymakers, public perception, influence on programs, contact with elected officials, and responsiveness to partisan politics and political leaders.' " *Ortiz–Piñero*, 84 F.3d at 12 (citing *O'Connor v. Steeves*, 994 F.2d 905, 910 (1st Cir. 1993) (quoting *Jiménez Fuentes v. Torres Gaztambide*, 807 F.2d 236, 241–42 (1st Cir. 1986) (en banc), *cert. denied*, 481 U.S. 1014, 107 S.Ct. 1888, 95 L.Ed.2d 496 (1987)) (other citations omitted)). As this is a Motion to Dismiss and not a Motion for Summary Judgment the Court will rely upon Plaintiff's allegation. *See* Legal Standard for Motion to Dismiss, *supra*. Further, in order to ascertain whether Plaintiff Santana occupied a policy making position, the Court will rely on statutory law and an executive order from the Governor of Puerto Rico.

### 1. Human Resources and Occupational Development Council

█ Under the first prong, it is necessary to analyze whether the agency or department was involved in public policy-making activities about which political differences were possible. It is not essential that an actual conflict about political concerns exists. The mere possibility that disagreement could arise as to the goals of the agency or the implementation of those goals demonstrates the importance of political differences. *See Méndez–Palou v. Rohena–Betancourt*, 813 F.2d 1255, 1258 (1st Cir.1987). *See also Juarbe–Angueira v. Arias*, 831 F.2d 11, 15 (1st Cir.1987) cert. denied, 485 U.S. 960, 108 S.Ct. 1222, 99 L.Ed.2d 423 (1988).

█ In order to understand the purpose and function of the HRODC, the Court first looks to the Workforce Investment Act of 1988 ("WIA") codified as 29 U.S.C. § 2811. The purpose of the WIA is to:

provide workforce investment activities, through statewide and local workforce investment systems, that increase the employment, retention, and earnings of participants, and increase occupational skill attainment by participants, and, as a result, improve the quality of the workforce, reduce welfare dependency, and enhance the productivity and competitiveness of the Nation.

29 U.S.C. § 2811 (West 1999). Puerto Rico's Governor, via executive order, ordered that "Federal funds received under WIA will be disbursed for the development of a workforce preparation and employment system designed to meet the needs of employers for skilled workers and the need of job seekers for education, training and employment." Administrative Bulletin No. OE–20002–06, pg. 1 (2000) (hereinafter abbreviated as "Ad. Bull.").

According to this same order, the WIA requires that the Governor establish a State Workforce Investment Board ("WIB") designed to assist the Governor in the development of a State Plan. *See Id.*; 29 U.S.C. § 2821(a). The WIB consists of the Governor, two members of each chamber of the State legislature, and various representatives appointed by the Governor. *See* Ad. Bull., at 1–3; 29 U.S.C. § 2821(b). These representatives are comprised of owners and operating officers of local businesses, chief elected officials, and representatives of labor organizations among others. *See* Ad. Bull., at 1–3; 29 U.S.C. § 2821(b)(1)(C). Those "members of the Board that represent organizations, agencies or other entities shall be individuals with optimum policy making authority within the organizations..." Ad. Bull., at 3; 29 U.S.C. § 2821(b)(2). The WIB assists the Governor in developing a State Plan and continuous improvement of a

statewide system of activities that are funded under the WIA. Ad. Bull., pg. 3; 29 U.S.C. § 2821(d). The WIB assists in the designation of local areas, the development of allocation formulas for the distribution of funds for adult employment and training activities and youth activities, the development and continuous improvement of comprehensive state performance measures, including State adjusted levels of performance, to assess the effectiveness of the workforce investment activities in the Commonwealth, the preparation of the annual report to the U.S. Secretary of Labor, the development of the statewide employment statistics system and the development of an application for an incentive grant. *Id.* Finally, the Order designates the HRODC as the depository and administrator of the funds that Puerto Rico receives in conformity with the WIA. Ad. Bull., at 7.

By statute, the HRODC is an agency ascribed to Puerto Rico's Department of Labor and Human Resources as an operational component. 18 P.R. Laws Ann. § 1584. "The Council is composed of the Secretary of Education, the Secretary of the Department of Family, the Secretary of Economic Development, the Secretary of Labor, who shall preside, three (3) representatives from the private sector and three (3) representatives of the public interest." 18 P.R. Laws Ann. § 1584 (1999) (Court's translation). The HRODC is in charge of marshaling and administering an annual budget exceeding over $300 million[5]. According to Section 1585 of the statute, the HRODC "council" is responsible for the following functions:

(a) Implement and enforce the public policy established in this legislation and such other that may be established in the future with regard to technological—occupational education and to the purposes of this chapter;

(b) Establish the specific objectives that shall redirect the system at the short or long term [sic], according to the established public policy and to the general objectives of the system provided in this chapter;

(c) Evaluate and approve the Strategic Five–Year Plan prepared by the Chairperson of the Council;

\* \* \* \* \* \*

(*l*) Evaluate and approve the requests for federal funds of the various components of the system subject to the limitations and procedures required by federal laws;

(m) Periodically evaluate and audit the educational programs and services offered by the system in order to determine their effectiveness in attaining the established objectives;

\* \* \* \* \* \*

(u) Submit periodic reports to the Governor and the Legislature regarding the achievement of the objectives and purposes of this chapter.[6]

18 P.R. Laws Ann. § 1585 (1999) (Court's Translation).

After examining the above mentioned legislation, it is clear that both the HRODC and WIB are unmistakably "department[s] or agenc[ies] [whose overall functions] involve 'decision making on issues where there is room for political disagreement on goals or their implemen-

---

**5.** These funds are primarily comprised of WIA, Carl D. Perkins and Welfare to Work funds. The Court notes that all of these funds are from Federal sources and do not come from the Treasury of the Commonwealth.

**6.** This list is not exhaustive of all the functions of the council.

tation.'" *O'Connor*, 994 F.2d at 910 (citations omitted). While the HRODC may be held by the dictates of policy decisions made by the WIB, there can be no doubt that the HRODC holds an important position in determining the allocation of funds to a number of different programs and in turn is creating public policy. Now that the first prong of the analysis has been satisfied, the Court turns to the second prong and the role of the Executive Director of the HRODC.

## 2. Executive Director

Under the second prong of the *Branti/Elrod* analysis, the Court must determine whether the position of Executive Director of the HRODC resembles that of "'a policymaker, privy to confidential information, a communicator, or some other office holder whose function is such that party affiliation is an equally appropriate requirement' for continued tenure." *Ortiz–Piñero*, 84 F.3d at 12 (citing *O'Connor*, 994 F.2d at 910 (citations omitted)). The Court keeps in mind that the First Circuit has held that:

> Whether a government position is "political" does not depend upon such loose-fitting labels as "confidential" or "policymaking," but on the substance of the duties inherent in the position itself. *Branti*, 445 U.S. at 518, 100 S.Ct. at 1294–95 (noting: "a position may be appropriately considered political even though it is neither confidential nor policymaking in character," and, by the same token, party affiliation is not a relevant consideration for all policymaking or confidential positions); *see Romero Feliciano v. Torres Gaztambide*, 836 F.2d 1, 3 (1st Cir.1987) (abjuring reliance on "rigid labels" in Branti /Elrod analysis).

*Ortiz–Piñero*, 84 F.3d at 12.

The Court first turns to the legislative description of the position and its duties.

The Governor shall appoint, with the advice and consent of the Senate, an Executive Director, for a term of four (4) years and until his/her successor has been appointed and takes office, who will direct the operational and administrative functions of the Council. The Governor shall set the salary of the Executive Director.

18 P.R. Laws Ann. § 1584 (2000) (Court's translation). The Governor's Executive Order concerning the WIB and WIA funds states:

> The Executive Director of the Occupational Development and Human Resources Council shall be responsible and accountable to the State Board for the receipt, custody and disbursement of the federal funds received pursuant to WIA and shall post a fidelity bond prescribed by the laws of Puerto Rico for public employees.

Ad. Bull. at 7.

Plaintiff Santana describes her duties as Executive Director in the following manner:

> As Executive Director, Plaintiff Santana received proposals or plans from each of the 15 regional or local boards. She reviewed each proposal to ensure it complied with the Puerto Rico WIB's pre-established five year plan. Once she reviewed the proposal she would submit it to the Puerto Rico WIB for their approval. She also was responsible for reviewing each regional board's monthly application for funds. She would determine if the application complied with all pre-established federal and state regulations. As Executive Director, Plaintiff Santana was responsible for auditing the 15 regional boards for accountability and compliance with all pre-established federal and state regulations. She moni-

tored technical assistance to local boards and one stop centers, she monitored Carl D. Perkins and Welfare to Work funding allocated to the Departments of Education and the Family and finally, she was responsible for training the regional boards on administrative and management issues in compliance with federal and state rules and regulations. Amended Complaint (docket No. 43).

Before going into the complete analysis of the Executive Director position, the Court finds it necessary to clarify a possible misconception. The Court believes that Defendants have confused Plaintiff Santana's position as Executive Director of the HRODC with her position as a member of the WIB. Defendants argue that since the Executive Director is responsible and accountable to the WIB, the Executive Director therefor is a member of the WIB. The fact that the Executive Director is accountable to the WIB by no means demonstrates that the Executive Director is a member of the WIB and the Court has not seen any statutory language demonstrating otherwise. Additionally, Defendants argue that the WIA mandates that the WIB include as members, "the lead state agency officials with responsibility for the programs and activities that are described in Section 2841(b)..." 29 U.S.C. § 2821(b)(1)(C)(vi)(I). In the case of the HRODC, the lead official is the Secretary of Labor and not the Executive Director. 18 P.R. Laws Ann. § 1584. Therefore, this portion of the statute does not evidence that the Executive Director is a mandatory member of the WIB.

The Court feels that Defendants are confusing Ms. Santana's two distinct positions. Santana has been a board member of the WIB since May of 2000[7]. The Court finds that this position is distinct

from her position as Executive Director of the HRODC, for two reasons: 1) Santana began her position as member of the WIB two months **before** she began her position as Executive Director; and 2) Santana **currently** holds her position as a member of the WIB although she no longer holds the position of Executive Director of the HRODC. For these reasons, the position of Executive Director of the HRODC does not automatically make one a member of the WIB. The Court **SHALL** rely upon this finding in order to determine whether or not the position of Executive Director of the HRODC can be considered to be a trust position.

The Defendants rely heavily on the *Ortiz–Piñero* case from the First Circuit, where the Appellate Court upheld this Court's decision to grant summary judgment. 84 F.3d 7. Defendants argue that the facts and analysis of the *Ortiz–Piñero* case are analogous to those before the Court today. The Court agrees that a similar analysis should be given in the case at bar. However, the Court finds the facts to be distinctly different.

Under the *Ortiz–Piñero* analysis, the Court must examine whether " 'the *particular responsibilities* of the plaintiff's position, within the [HRODC], resemble those of "a policymaker, privy to confidential information, a communicator, or some other office holder whose function is such that party affiliation is an equally appropriate requirement" for continued tenure' " 84 F.3d at 13 (citing *O'Connor*, 994 F.2d at 910 (citations omitted)) (emphasis included). The first element in the First Circuit's analysis was the fact that there was no written job description for the position in question. *Ortiz–Piñero*, 84 F.3d at 13. In fact, the Court held that "written,

---

7. The Court need not analyze whether this is a political position or not as the suit does not concern this position but rather only that of Executive Director of HRODC.

signed job descriptions may provide highly probative evidence as to the responsibilities inherent in a particular government position, and may even prove 'dispositive.'" *Id.* (citing *Romero Feliciano*, 836 F.2d at 3). Although, the written job descriptions in the case at bar are not explicit or detailed, they do appear to limit the duties of the Executive Director to administrative and operational duties and do not include duties such as creating or implementing policy.

Following the *Ortiz–Piñero* analysis, the Court will now look to the responsibilities inherent in the position. The probative indicia of whether a position is political includes "'"relative pay, technical competence, power to control others, authority to speak in the name of policymakers, public perception, influence on programs, contact with elected officials, and responsiveness to partisan politics and political leaders."'" *Ortiz–Piñero*, 84 F.3d at 14 (citing *O'Connor*, 994 F.2d at 910) (citations omitted).

The first consideration the First Circuit used in its analysis was that Ortiz did not have to compete for his position. *Ortiz–Piñero*, 84 F.3d at 14. There is a similarity here because the position of Executive Director is appointed by the Governor. However, the Appellate Court noted that Ortiz acknowledged that he did not have any special skills pertinent to his position. *Id.* In the present case, Plaintiff Santana appears to have significant expertise in the disbursement of large quantities of federal funds, from her positions with the Puerto Rico Department of Education. According to her allegations, she was in charge of a $38 million budget in 1994 and a $600 million budget in 1995. Additionally, she had worked closely with government officials in applying and enforcing both Federal and Commonwealth policy and laws.

The next consideration in *Ortiz–Piñero* was that Mr. Ortiz was the head of his department. This is not the case here. As stated earlier, the head of the HRODC is the Secretary of Labor. While the Executive Director is the administrative head, the position does not direct the agency as a whole. The Defendants analogize Ortiz's duties as being potentially the same as Plaintiff Santana. Both positions dealt with the administration of federal monies to various projects, the auditing of those projects and the supervision of a staff. The Court acknowledges that from that stand point the two positions appear to be very similar. However, the difference lies in who is looking over the Executive Director's shoulder. In *Ortiz–Piñero*, Ortiz met directly with the Mayor "an average of six or seven times a year," thus giving Ortiz a considerable amount of autonomy in his duties. *Ortiz–Piñero*, 84 F.3d at 15. In the case at bar, Santana did not have the same level of professional autonomy. There are at least three different organizations or individuals monitoring the Executive Director's work: the Secretary of Labor, the HRODC Council itself, the WIB and the federal government, to whom the Executive Director must file reports. Any discretion or "wiggle room" the Executive Director has is quite limited. The Court infers that this is to ensure that the WIA funds are being administered in accordance with the established "Five Year Plan," and both Commonwealth and Federal labor policy.

Finally, the largest difference between the position in question in *Ortiz–Piñero* and the current case is that Ortiz was notified, by an executive order of the *previous* mayor that his position was one of the eleven (11) trust positions in the municipality. *Ortiz–Piñero*, 84 F.3d at 15. No such order was made in this case. Instead, Plaintiff relied on her appointment to a position that had a term of four

years that was scheduled to end in July, 2004 [8].

As the Court stated earlier, there can be little to no doubt that the HRODC helps shape Commonwealth policy. However, the Court cannot see, at this point in the litigation, how the position of Executive Director is a "political" one. Rather, it appears that the Executive Director guides and enforces policies determined by the Commonwealth and the Federal Government. The Executive Director has nearly no room to vary from the course set forth by the HRODC, the WIB and the WIA itself. For this reason, the Court **DE-NIES** Defendant's claims that the position of Executive Director of the HRODC is a political or trust position thus preventing Plaintiffs to state a claim for political discrimination.

### C. Due Process—Property Interest

Defendants argue that Plaintiff Santana does not have a property right in her employment and thus was not entitled to a pretermination hearing.

> The pretermination (sic) process due a government employee is a matter of federal law, whereas the preliminary question whether a government employee possessed a protectable (sic) "property right" or a legitimate expectation of continued employment, is controlled by the employment contract or state law.

*Ortiz–Piñero,* 84 F.3d at 15 (citing *Rivera–Flores v. Puerto Rico Tel. Co.,* 64 F.3d 742, 749 (1st Cir.1995)).

■ A property interest is created by "existing rules or understandings that stem from an independent source such as state law." *Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, 538, 105 S.Ct. 1487, 1491, 84 L.Ed.2d 494 (1985). *De La*

*Cruz Andreu v. Inclán,* 671 F.Supp. 109 (D.P.R.1987); *see also, Depto. Recursos Naturales v. Correa,* 118 D.P.R. 689 (1987) (holding that a public employee had a right in his employment if that right is either protected by law or if the circumstances of his employment have created an expectation of continuity, that employees nominated to a fixed term position will have transitory status, and the duration of the nomination will run throughout the period of the term).

■ It is well established, both in Puerto Rico and in federal law, that a person has secured a property right in his employment if he has an expectation of continuity in said employment. *Nieves–Villanueva v. Soto–Rivera,* 133 F.3d 92 (1st Cir.1997) (citing *Caro v. Aponte–Roque,* 878 F.2d 1, 4–5 (1st Cir.1989); *Díaz Martínez v. Policía de Puerto Rico,* 134 D.P.R. 144 (1993); *Orta v. Padilla Ayala,* 131 D.P.R. 227 (1992)). Once an employee has established that he has a property right in his employment, the same is cloaked with constitutional protection. *Perry v. Sindermann,* 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972); *Board of Regents of State Colleges v. Roth,* 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972).

[8] The position of Executive Director of the HRODC is statutorily created. For this reason, the Court must examine the statutory language to determine whether Plaintiff Santana does indeed have a property interest in her former position. It has been clearly established that in construing a statute, a reviewing court must look first to the statutory language. "If the language is clear and unambiguous, judicial inquiry is at an end in all but the most extraordinary circumstances, and the court must give effect to the clear meaning

---

**8.** A more extensive examination as to the term of the Executive Directors appointment can be found in the analysis of Plaintiff Santana's property right. *Infra.*

of the statute as written." *Estate of Cowart v. Nicklos Drilling Co.*, 505 U.S. 469, 475, 112 S.Ct. 2589, 2594, 120 L.Ed.2d 379 (1992). *See also Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 201, 96 S.Ct. 1375, 1384, 47 L.Ed.2d 668 (1976) (When the Court finds the statutory language to be unambiguous, its clear meaning is controlling and the Court does not need to refer to any other source to interpret its meaning); *National R.R. Passenger Corp. v. Boston & Maine Corp.*, 503 U.S. 407, 417, 112 S.Ct. 1394, 1401, 118 L.Ed.2d 52 (1992) (The controlling principle of statute interpretation is the basic and unexceptional rule that courts must give effect to the clear meaning of statutes as written) (citing *Chevron U.S.A. Inc., v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984)).

The Court now turns to the enabling statute. However, rather than merely looking at the term description for the position of Executive Director, the Court chooses to look at the term descriptions for all positions described in the statute. The Court will first look at the term description for those members of the HRODC who are not a part of the Governor's cabinet.

> The [Council] members from the private sector and the member[s] of the public interest will be appointed for a term of five (5) years each and will occupy their positions, until the expiration date of their respective appointments or until their successors have been named and have taken over their positions.

18 Laws P.R. Ann. § 1504 (2000) (Court's Translation) (emphasis added). Now the Court will turn to the term description for the position of Executive Director.

> The Governor shall appoint, with the advice and consent of the Senate, an Executive Director, for a term of four

(4) years **and** until his/her successor has been appointed and takes office...

18 P.R. Laws Ann. § 1584 (2000) (Court's translation) (emphasis added). The only other provision in the enabling statute related to term of employment is as follows:

> Any vacancy that occurs in the HRODC before expiration of the member's term of appointment shall be filled in the same form and manner that he/she was appointed and for the unexpired term of the member occasioned the vacancy.

18 P.R. Laws Ann. § 1584 (2000).

Aside from the obvious difference in term length (four years versus five) the major difference lies in the difference between two words, "or" and "and." Although small, the Court finds the weight of this difference is enormous.

In the first section, the board members are appointed to a term that will last for five years *or* until someone has been appointed to and subsequently does actually replace them. Therefor the word "or" signifies that this position can be held for a term *no longer than* five years and potentially *shorter* dependant upon the Governor's desire. The Executive Director, however, is appointed to a term that will last for four years **and** until someone has been appointed to and subsequently does actually replace him or her. Therefor the word "and" signifies that this position will be held for a term of *at least* four years if not *longer* dependant upon the Governor's desire.

As the Court stated earlier, there is no doubt that the council members of the HRODC are significantly involved with the shaping of public policy. For this reason, it follows that their appointments would be limited not only by time but also by the Governor's ability to replace any member at any time with someone that is more politically aligned with the Governor herself. However, the fact that the Executive

Director is not limited to, but rather guaranteed, a term of years is consistent with the Court's analysis above in finding that the position of Executive Director is a non-political one.

Now that the Court has determined that the Executive Director's position was for a minimum term of four years, the Court will examine whether this would entitle Plaintiff Santana to a property interest in the same position. This Court was recently faced with similar circumstances in the case of *Quiles Rodríguez v. Calderón*, 172 F.Supp.2d 334 (2001) (J. Pieras). There this Court found that Quiles had a property interest in his position, to which he was appointed by the previous governor for a fixed term. *Quiles Rodríguez*, 172 F.Supp.2d at 344. This Court found that the authority of the Governor to carry out appointments is analogous to that of the President of the United States. *Quiles Rodríguez*, 172 F.Supp.2d at 342 (citing Op. Sec. Just. No. 3 of 1995, 1 P.R. Laws Ann. Art. IV § 4, n.7). This Court also found that the Governor's power to remove was similarly limited as that of the President's.

> *Humphrey's* therefore stands for the proposition that only officers that occupy purely executive positions are subject to the President's power of removal. [*Humphrey's Ex'r v. United States*, 295 U.S. 602, 624, 55 S.Ct. 869, 79 L.Ed. 1611 (1935)]. As applied to the case bar, we can only conclude that those occupying term positions in agencies in a quasi-legislative and quasi-judicial functions likewise cannot be removed under any circumstance, except for just cause.

*Quiles Rodríguez*, 172 F.Supp.2d at 343 (citing *Humphrey's*, 295 U.S. at 624, 55 S.Ct. 869; 3 P.R. Laws Ann. § 1336 (2000).) Additionally, this Court found it clear that the Governor did not have the automatic right to remove someone from a term position absent a clear delegation of removal authority stated explicitly in the statute. *Quiles Rodríguez*, 172 F.Supp.2d at 343.

When the Court applies this analysis to the facts at hand the difference between the council members of the HRODC and the Executive Director becomes clearer still. Section 1584 gives the Governor the power to remove the council members by replacing them. However, the statute does not grant the Governor the power to remove and replace the Executive Director until the appointment term had been completed.

The Court finds that Plaintiff does indeed have a property interest in employment and was entitled to a pre-termination hearing. For this reason, the Court hereby **DENIES** Defendants' Motion to Dismiss Plaintiff Santana's Due Process Claims.

### 1. Liberty Interest

As the Court has found that Plaintiff Santana has a property interest in her employment, it is unnecessary for the Court to examine her liberty interest. For this reason, the Court **DENIES AS MOOT** Defendants' Motion to Dismiss Plaintiff Santana's Liberty Interest claims.

### D. Conspiracy

### 1. 42 U.S.C. § 1985(3)

█ Defendants argue that Plaintiff Santana's allegations fail to state a claim for conspiracy under 42 U.S.C § 1985(3). The statute in its most pertinent portion describes conspiracy as follows:

> [I]f two or more persons in any State or Territory conspire or go in disguise on the highway or on the premises of another, for the purpose of depriving, either directly, or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws...

42 U.S.C. § 1985(3)(West 2001). The Supreme Court has written on this very section and has found that the language requiring the intent to "deprive of *equal* protection or *equal* privileges and immunities, means that there must be some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action." *Griffin v. Breckenridge*, 403 U.S. 88, 102, 91 S.Ct. 1790, 1798, 29 L.Ed.,2d 338 (1971); *see also Kush v. Rutledge*, 460 U.S. 719, 103 S.Ct. 1483, 75 L.Ed.2d 413 (1983); *Mass. v. McClenahan*, 893 F.Supp. 225 (S.D.N.Y.1995).

 In the case at bar, the Plaintiffs allege a conspiracy to remove Plaintiff Santana from her position as Executive Director of the HRODC based solely upon her political affiliation. Plaintiffs argue that Santana's political affiliation placed her into a "class" and that her active membership in the PNP is the basis for her claim under Section 1985(3). The Court disagrees. PNP membership is not based upon race or class but rather upon free choice. While Plaintiffs' allegations are sufficient to maintain a claim for political discrimination, they are simply insufficient to support a claim of conspiracy under the auspices of 42 U.S.C. § 1985(3). Plaintiffs have failed to allege any racial or other class-based, discriminatory animus behind the alleged conspirator's action, which is necessary to support this claim. For this reason the Court hereby **GRANTS IN PART** Defendant's Motion to Dismiss Plaintiff Santana's claim of Conspiracy under 42 U.S.C. § 1985(3).

## 2. 42 U.S.C. § 1983

 The First Circuit has defined a civil rights conspiracy as

"a combination of two or more persons acting in concert to commit an unlawful act, or to commit a lawful act by unlawful means, the principal element of which is an agreement between the parties 'to inflict a wrong against or injury upon another,' and 'an overt act that results in damages.'"

*Earle v. Benoit*, 850 F.2d 836, 844 (1st Cir.1988) (citing *Hampton v. Hanrahan*, 600 F.2d 600, 620–21 (7th Cir.1979), rev'd in part on other grounds, 446 U.S. 754, 100 S.Ct. 1987, 64 L.Ed.2d 670 (1980)). However, in an effort to control frivolous conspiracy suits under § 1983,

federal courts have come to insist that the complaint state with specificity the facts that, in the plaintiff's mind, show the existence and scope of the alleged conspiracy. It has long been the law in this and other circuits that complaints cannot survive a motion to dismiss if they contain conclusory allegations of conspiracy but do not support their claims with references to material facts.

*Slotnick v. Staviskey*, 560 F.2d 31, 34 (1st Cir.1977) (citing *Dunn v. Gazzola*, 216 F.2d 709, 711 (1st Cir.1954); *Kadar Corp. v. Milbury*, 549 F.2d 230 (1st Cir.1977); *Fletcher v. Hook*, 446 F.2d 14 (3rd Cir. 1971); *Johnson v. Stone*, 268 F.2d 803 (7th Cir.1959); *Ellingburg v. King*, 490 F.2d 1270 (8th Cir.1974); *Powell v. Jarvis*, 460 F.2d 551 (2nd Cir.1972)).

It is clear that Plaintiffs are alleging that Plaintiff Santana was deprived of her constitutional rights. For this reason, Plaintiffs' complaint passes the first hurdle for alleging conspiracy under Section 1983. *See Landrigan v. City of Warwick*, 628 F.2d 736 (1st Cir.1980). For the second portion, Defendants argue that the Plaintiffs have not alleged conspiracy with enough specificity to create a cause of action for conspiracy under Section 1983.

The Court agrees with Defendants, to the extent that, Plaintiffs have not given information about specific conversations or meetings. However, the Court also acknowledges that the current litigation is

just beginning and that there has not been discovery to better crystalize the allegations. Plaintiffs have alleged that there were meetings that Plaintiff Santana should have attended that occurred without her consent and knowledge; that Defendants worked in a concerted effort to audit Plaintiff Santana's work in order to unreasonably find excuses for her termination; that Defendants were behind the alleged harassing phone calls, letters and other misconduct; that Defendants worked in some sort of concerted effort to have Plaintiff terminated from her position; and that Defendants conspired to tarnish Plaintiff Santana's reputation in general. The Court acknowledges that Plaintiffs will need to substantiate these claims in order to gain the remedy they seek. However, the Court finds that at this point in the litigation, Plaintiffs' allegations are sufficient to bring suit for conspiracy under Section 1983. For this reason, the Court hereby **DENIES** Defendants' Motion to Dismiss Plaintiffs' claims of conspiracy under Section 1983.

### 3. Involvement of Mr. Xavier González Calderón

Defendants argue that Plaintiffs have failed to allege anything that would connect Co–Defendant González Calderón to the violations alleged by Plaintiffs. As the Court established in the previous section, Plaintiffs have made sufficient allegations to maintain their claim for conspiracy under Section 1983. As Co–Defendant González Calderón is a named party in these allegations, specifically in the allegations for conspiracy, it is necessary for Co–Defendant González Calderón to remain a party in this case. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *Slotnick*, 560 F.2d 31. For this reason the Court hereby **DENIES** Defendants' Motion to Dismiss

Plaintiffs' claims against Co–Defendant González Calderón.

### E. Qualified Immunity

The doctrine of qualified immunity protects government officials who perform discretionary functions from suit and from liability for monetary damages under 42 U.S.C. § 1983. *See Roldán–Plumey v. Cerezo–Suárez*, 115 F.3d 58, 65 (1st Cir.1997). This defense is designed to create a rebuttable presumption of immunity from personal liability to cover all executive officers that perform discretionary functions. *See Id.; Scheuer v. Rhodes*, 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974).

The general rule regarding qualified immunity is that government officials are immune from suit when their conduct does not violate clearly established statutory authority or constitutional rights, which a reasonable person should have known of at the time of the conduct at issue. *Mitchell v. Forsyth*, 472 U.S. 511, 524, 105 S.Ct. 2806, 2814, 86 L.Ed.2d 411 (1985); *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). Furthermore, the "contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Acevedo–García v. Vera–Monroig*, 204 F.3d 1, 10 (1st Cir. 2000).

In other words, the test has two prongs. First, the Court must determine, as a matter of law, whether the constitutional right in question was clearly established at the time of the alleged violation. *Hilaire v. Laconia*, 71 F.3d 20 (1st Cir. 1995). Second, if it finds that said right was clearly established, the question then remains whether a similarly situated official reasonably "should have understood that the challenged conduct violated" that right. *Id.* at 24.

In order to defeat the qualified immunity defense, a plaintiff must show that the defendant-official knew or reasonably should have known that the actions he took within his sphere of official responsibility would violate the constitutional rights of the people affected by his actions. *Wood v. Strickland,* 420 U.S. 308, 322, 95 S.Ct. 992, 997, n. 6, 43 L.Ed.2d 214 (1975); *see also Crawford–El v. Britton,* 523 U.S. 574, 118 S.Ct. 1584, 140 L.Ed.2d 759 (1998). A plaintiff may not overcome the defense by alleging, even if fortified with evidence, that the governmental official acted in a malicious manner or in some way was improperly motivated. Evidence concerning the defendant's subjective intent is no longer relevant or part of the qualified immunity defense. *Harlow,* 457 U.S. at 817, 102 S.Ct. 2727; *Crawford–El,* 523 U.S. at 588, 118 S.Ct. 1584; *Wyatt v. Cole,* 504 U.S. 158, 112 S.Ct. 1827, 118 L.Ed.2d 504 (1992).

When discussing qualified immunity in the context of political discrimination there is an even thinner legal distinction to be examined. The First Circuit has held that a defendant enjoys qualified immunity so long as the position in question "potentially concerned matters of partisan political interest and involved at least a modicum of policymaking responsibility, access to confidential information, or official communication." *Méndez–Palou v. Rohena–Betancourt,* 813 F.2d 1255, 1259 (1st Cir.1987). Additionally, in a decision of the same year concerning political discrimination, the First Circuit reiterated that, "only where the action in question is *clearly* unlawful does a defendant lose his qualified immunity." *Juarbe–Angueira v. Arias,* 831 F.2d 11, 12 (1st Cir.1987) (citing *Harlow,* 457 U.S. at 818, 102 S.Ct. at 2738) (emphasis included).

In the current case, the Court faces somewhat of a dilemma. On one hand the Court has the job description of the position of Executive Director. The Court has held that, at this point in the litigation, the allegations would lead the Court to believe that this position was not a "trust" or "political" position. *See infra.* However, this does not mean that the position did not entail at least a "modicum of policy making" or provide the holder with access to confidential documents. *See Méndez–Palou,* 813 F.2d at 1259. More importantly, the law is not so clearly established that someone in Defendants' position would not believe that the Executive Director's position was a "trust" or "political" position, thus evoking the protections of qualified immunity. Therefore, under this analysis the Court **GRANTS IN PART** Defendant's Motion for Qualified Immunity as to Plaintiffs' claims of political discrimination. However, Plaintiffs do not allege merely that Plaintiff Santana's First Amendment rights were violated due to political discrimination, they additionally allege that Plaintiff Santana's Due Process rights were violated by her being denied a termination hearing.

In the interest of Plaintiff Santana's Due Process rights, the Court must also examine the term set by statute for the Executive Director position. The Court has held that the statutorily created term limit for the Executive Director position guarantees the holder a right to that position for *at least* four years. *See infra; see also Quiles,* 172 F.Supp.2d 334. However, the *Quiles* opinion was not issued until November 7, 2001, well after Plaintiff Santana was terminated from her position. For this reason, Defendants would not have been on notice of the importance of set terms in such a position.

Although the Court relied upon the analysis in *Quiles,* it did not base its opinion solely upon that case. Instead, the Court relies upon the clear language of the stat-

ute. As the Court has stated earlier, it is clear that there is a difference between the position of Executive Director and that of the council members. *See infra.* It is this clear language upon which the Court hinges its opinion in the issue at hand. It is clear that the individual holding the position of Executive Director of the HRODC is entitled to that position for a term of *at least* four years. Therefore, the law was clearly established and a reasonable person would know that terminating someone from that position for anything other than just cause, and without the benefit of a termination hearing would potentially violate an individual's Due Process Rights. In conclusion, Defendants' argument for qualified immunity rests upon Plaintiffs' allegations of political discrimination and does not address the alleged violations of Plaintiff Santana's Due Process Rights. For this reason, under Plaintiffs allegations at this point in the litigation, the Court **DENIES IN PART** Defendants' request to grant qualified immunity upon Defendants.

In conclusion, the Court hereby **GRANTS IN PART** Defendants' Motion to Dismiss based upon qualified immunity, only regarding Plaintiffs' claims of political discrimination and **DENIES IN PART** Defendants' request for qualified immunity for all other claims. The Court further clarifies that its decision to grant qualified immunity, in part, is in no way determinative as to whether Plaintiff Santana was indeed the victim of political discrimination. Rather, qualified immunity simply limits Defendants liability in their **personal capacities** for Plaintiffs' political discrimination claim. However, all claims brought forth by Plaintiffs against Defendants in their **official capacities,** remain before this Court.

### F. Derivative Suit by Esteban Pérez

■ The Court has stated earlier in this opinion, that to prevail in an action brought under 42 U.S.C. § 1983, a plaintiff must show that he or she was deprived of a right privilege, or immunity secured by the Constitution or laws of the United States. *See infra.* Section IV(A). The Defendants posit that Co–Plaintiff Esteban Pérez lacks standing to sue under 42 U.S.C. § 1983 because he is not alleging being deprived of a right, privilege, or immunity secured by the Constitution or laws of the United States. This Court has held that a plaintiff cannot bring a suit under § 1983 for alleged constitutional violations that have occurred to his or her spouse. *See Quiles,* 172 F.Supp.2d at 347. However, this does not preclude spouses from bringing pendent claims. *See Nieves Domenech v. Dymax Corp.,* 952 F.Supp. 57, 66 (D.Puerto Rico 1996) (holding that "It is true that under Puerto Rico law, the spouse or relatives of an individual may have a derivative Article 1802 action for injuries suffered directly by the individual").

■ Plaintiffs claim that Mr. Pérez' claims derive from Article 1802 under Puerto Rico Law, 31. P.R. Laws Ann. § 5141. The Supreme Court has set forth a three part test for evaluating jurisdiction over pendent parties in federal question cases:

(1) the pendent party's claim must share a common nucleus of operative fact with a claim over which federal courts have jurisdiction, and the parties must also expect to try the claims in the same proceeding; (2) the exercise of pendent party jurisdiction must not be expressly or implicitly disapproved by the statute creating jurisdiction over the claim to which the pendent party appends her claim; and (3) pendent party jurisdiction must promote judicial economy and avoid jury confusion.

*Aldinger v. Howard,* 427 U.S. 1, 14–16, 96 S.Ct. 2413, 2420, 49 L.Ed.2d 276, 286–87 (1976).

It is evident that Mr. Pérez' claims arise from the same nucleus of operative facts as that of his wife. Plaintiffs argue that Pérez sustained great emotional anguish and despair from witnessing first-hand his wife's suffering as a direct consequences of the allegedly discriminatory actions of the defendants. As for the second prong of the aforementioned test, the First Circuit has addressed this issue and has held that a Federal District Court may exercise pendent jurisdiction over state-law claims of a § 1983 plaintiff's spouse, provided the claims share a common nucleus of operative fact with the § 1983 claims. *See Rodríguez v. Comas,* 888 F.2d 899, 905 (1st Cir.1989). Finally, the Court finds that admitting Mr. Pérez' claims promotes judicial economy and sees no unfairness to defendants in allowing him to pursue his claim as part of his wife's case. Therefore the Court hereby **DENIES** Defendant's motion to dismiss Co–Plaintiff Pérez' pendent claims.

## V. CONCLUSION

In view of the foregoing discussion, the Court hereby: **GRANTS IN PART** Defendants' Motion to Dismiss and therefore **DISMISSES WITHOUT PREJUDICE** Plaintiffs' claim of conspiracy under 42 U.S.C. § 1985(3) against all Defendants; **GRANTS IN PART** Defendants' Request for Qualified Immunity for Defendants and therefore **DISMISSES WITHOUT PREJUDICE** Plaintiffs' Political Discrimination claims against Co–Defendants, Governor Sila María Calderón, Xavier González and Víctor Rivera Hernández in their personal capacities; and **DENIES IN PART** Defendants' Motion to Dismiss on all other grounds.

**IT IS SO ORDERED.**