# United States Court of Appeals

## For the First Circuit

Nos. 02-1436
     02-1437
     02-1438

JANET SANTANA; ESTEBAN PÉREZ;
CONJUGAL PARTNERSHIP PÉREZ-SANTANA,

Plaintiffs, Appellees,

v.

SILA M. CALDERÓN, individually and as Governor of Puerto Rico;
XAVIER GONZÁLES-CALDERÓN; VÍCTOR RIVERA, individually
and as Secretary of Labor & Human Resources of Puerto Rico,

Defendants, Appellants.

--------

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO
[Hon. Jaime Pieras, Jr., U.S. Senior District Judge]

--------

Before

Boudin, Chief Judge,
Bownes, Senior Circuit Judge,
and Lipez, Circuit Judge.

--------

Irene S. Soroeta-Kodesh, Assistant Solicitor General, Puerto Rico Department of Justice, with whom Roberto J. Sánches Ramos, Solicitor General, and Vanessa Lugo Flores, Deputy Solicitor General, were on brief, for appellants Calderón and González-Calderón.
     Celina Romany, with whom Juan M. Frontera Suau was on brief, for appellant Rivera.
     Joan Schlump Peters, with whom Andrés Guillemard-Noble and Monique Guillemard-Noble were on brief, for appellees.

--------

August 26, 2003

--------

**LIPEZ**, **Circuit Judge**. This case comes to us on an interlocutory appeal and requires us to determine whether the defendants, Sila M. Calderón ("Calderón"), Governor of Puerto Rico, Xavier González-Calderón, current Executive Director of the Human Resources and Occupational Development Council, and Víctor Rivera, Secretary of Labor and Human Resources of Puerto Rico, (collectively "defendants"),[1] are entitled to qualified immunity in a case brought by Plaintiffs Janet Santana ("Santana"), former Executive Director of the HRODC, and her husband, Esteban Pérez.[2] Santana sued the defendants under 42 U.S.C. § 1983 and the corresponding laws of the Commonwealth of Puerto Rico, seeking injunctive relief and compensatory and punitive damages. The complaint alleged (1) that defendants violated Santana's First Amendment rights by politically discriminating against her and creating a hostile work environment which culminated in her dismissal from her position as Executive Director of the Human Resources and Occupational Development Council ("HRODC"); (2) that the defendants conspired to remove her from her position as

---

[1] Defendants Calderón and Rivera were sued in both their individual and official capacities. However, because the only issue before us on interlocutory appeal is that of qualified immunity, we address the defendants only in their individual capacities. Brandon v. Holt, 469 U.S. 464, 472-73 (1985) (holding that an official sued in his official capacity may not take advantage of a qualified immunity defense).

[2] Because the claims brought by Santana's husband are derivative of Santana's claim, we designate Santana the "plaintiff" and refer to the co-plaintiff by name where necessary.

Executive Director of the HRODC based solely on her political affiliation; and (3) that her dismissal violated her Fourteenth Amendment due process rights because she had a property interest in her position. On defendants' motion to dismiss, the district court granted the defendants qualified immunity on the political discrimination claim, but denied qualified immunity on the Fourteenth Amendment due process claim. The defendants appealed this denial of qualified immunity. We conclude that the district court erred in rejecting the claim of defendants to qualified immunity on the due process claim of plaintiffs.

**I.**

In 1998, the United States Congress passed the Workforce Investment Act (WIA), 29 U.S.C. §§ 2801-2945 (2003), to

> provide workforce investment activities, through statewide and local workforce investment systems, that increase the employment, retention, and earnings of participants, and increase occupational skill attainment by participants, and, as a result, improve the quality of the workforce, reduce welfare dependency, and enhance the productivity and competitiveness of the Nation.

29 U.S.C. § 2811. To be eligible to receive federal funds under the WIA, a state must submit a State Plan outlining a five-year strategy for the statewide workforce investment system. The WIA requires the Governor of each state to establish a state Workforce Investment Board (WIB) to assist in the development of the State

Plan. The WIB consists of the Governor, two members of each chamber of the State legislature, and representatives appointed by the Governor, including representatives of business, chief elected officials of municipal and county governments, representatives of labor unions, individuals or representatives of organizations that have experience with youth activities and education, and State agency officials with responsibility for related programs and activities. 29 U.S.C. §§ 2821-2822.

To assist him in fulfilling his duties under the WIA, the former Governor, Pedro Rosselló, designated the HRODC by executive order as the depository and administrator of the funds that Puerto Rico received pursuant to the WIA. The HRODC is an agency attached to the Department of Labor and Human Resources of the Commonwealth of Puerto Rico, created pursuant to 18 P.R. Laws Ann. § 1584 (2002) to be the governing body of the Occupational and Human Resources Development System: a "conglomerate of agencies, programs or operating units that, directly or indirectly, offer services related to non-university technological-occupational education." 18 P.R. Laws Ann. § 1581 (2002). The HRODC "shall retain the counseling, coordination, and establishment of public policy functions and shall be the regulatory and supervisory entity of the [] system." 18 P.R. Laws Ann. § 1584. The HRODC is composed of the Secretary of Education, the Secretary of the Department of Family, the Secretary of Economic Development, the Secretary of

-4-

Labor, three representatives from the private sector, and three representatives of the public interest. 18 P.R. Laws Ann. § 1584. The HRODC is responsible for, inter alia, developing and implementing public policy with respect to occupational education, administering a $300 million dollar annual budget comprised of federal funds disbursed under the WIA, evaluating and approving requests for such funds, evaluating and auditing programs and services receiving such funds, and submitting periodic reports to the Governor and the legislature regarding the achievement of the objectives and purposes of the WIA. 18 P.R. Laws Ann. § 1585 (2002). The Executive Director of the HRODC "shall direct the administrative and operating functions of the Council," 18 P.R. Laws Ann. § 1584, and, according to the Governor's Executive Order, "shall be responsible and accountable to the [WIB] for the receipt, custody and disbursement of the federal funds received pursuant to the WIA."

## A. Santana's Employment

Santana began working as a public servant in 1994 at the Puerto Rico Department of Education. From January 1997 until July 2000, she worked in the Office of the Governor as Advisor to the Governor on Federal Affairs. In May 2000, Santana was appointed as a member of the WIB, a position she still holds. In July 2000, Santana was appointed by then-Governor Rosselló as Executive Director of the HRODC and was confirmed by the Senate of Puerto

Rico for a four-year term which was to expire in July 2004. In November 2000, defendant Calderón was elected Governor of the Commonwealth of Puerto Rico, and in January 2001, she took office.[3] Calderón appointed co-defendant Rivera as the Secretary of Labor and Human Resources. Co-defendant González-Calderón had been the Regional Director of the Carolina-Trujillo Alto Consortium of the WIB. After Governor Calderón won the gubernatorial election, she appointed González-Calderón Auxiliary Secretary of Planning and Special Assistant of Federal Affairs for the WIB.

In her complaint Santana alleges that after the elections and Rivera's appointment as Secretary of Labor and Human Resources, she was subjected to "an intense persecution and harassment campaign for her political affiliation as member of the NPP."[4] Santana v. Calderón, No. 01-1576, slip op. at 5 (D.P.R. Feb. 15, 2002) (order on defendants' motion to dismiss). Among other things, she received anonymous insulting letters and harassing telephone calls, and career position employees at the HRODC made frequent remarks about Santana's imminent dismissal. The

---

[3] Both Santana and former Governor Rosselló are members of the New Progressive Party (NPP). Governor Calderón is a member of the Popular Democratic Party (PDP).

[4] Because the qualified immunity issue before us does not involve Santana's claim that the defendants politically discriminated against her and created a hostile work environment which culminated in her dismissal from her position as Executive Director of the HRODC, we recite the facts specific to this claim only to provide context for Santana's due process claim.

-6-

harassment reached its climax on February 26, 2001, when Santana received a voodoo doll covered in pins and a copy of her signature pinned to the doll's chest. On March 9, 2001, a group of six people consisting largely of employees of the Department of Labor and Human Resources went to Santana's office and gave Santana a letter dated March 7, 2001 signed by Governor Calderón, ordering the immediate termination of her employment as Executive Director of the HRODC. Santana was given fifteen minutes to vacate her office and one member of the group immediately began changing the locks. While Santana was clearing her office, a reporter from a radio station came to interview her. Although the employees from the Department of Labor tried to impede his access, Santana was able to speak to the reporter. Later the same day, defendant Rivera made several declarations to the press stating the alleged reasons for Santana's dismissal, which Santana claims are "untrue and defamatory." Santana, No. 01-1576, slip op. at 10. Santana was not given prior notice of her termination or an opportunity to defend herself from the alleged grounds for her termination. Defendant González-Calderón was appointed Executive Director of the HRODC in place of Santana and currently holds the position.

**B. Procedural Posture**

On December 17, 2001, Santana filed a second amended complaint in the United States District Court for the District of

Puerto Rico seeking injunctive relief[5] as well as compensatory and punitive damages under 42 U.S.C. §§ 1983, 1985(3), and corresponding laws of Puerto Rico, for assorted violations of her rights.  On December 21, 2001, the defendants filed a Rule 12(b)(6) motion to dismiss the amended complaint on the following grounds: (1) Santana's position as Executive Director of the HRODC is a trust position and therefore political affiliation is a justifiable ground for dismissal in the interest of public policy; (2) Santana did not have a property interest in her position and, thus, could not have been deprived of her right to due process under the Fourteenth Amendment; and (3) defendants in their individual capacities are entitled to qualified immunity.[6]

The district court found that

there can be little doubt that the HRODC helps shape Commonwealth policy.  However, the Court cannot see, at this point in the litigation,

---

[5]  In her complaint, Santana claims she is entitled to "complete restitution of her position with salary, duties, responsibilities of said position . . . . Plaintiff is also entitled to injunctive relief enjoining defendants from further discrimination against her because of her political beliefs and association now and in the future."

[6]  The defendants also claimed that Santana has not demonstrated that defendant González-Calderón had any personal involvement in the alleged violations; that the allegations fail to state a claim for conspiracy under either § 1983 or § 1985(3); and that Plaintiff Esteban Pérez lacks standing to bring suit. The district court denied defendants' motions on all these grounds with one exception: the district court granted defendants' motion to dismiss Santana's claim of conspiracy under § 1985(3) (but denied the motion to dismiss the claim of conspiracy under § 1983). Santana, No. 01-1576, slip op. at 42.

-8-

> how the position of Executive Director is a
> "political" one . . . . For this reason, the
> Court denies Defendants' claims that the
> position of Executive Director of the HRODC is
> a political or trust position thus preventing
> Plaintiffs to state a claim for political
> discrimination.

Santana, No. 01-1576, slip op. at 25-26.  The district court also found that the statute establishing the position of Executive Director of the HRODC provides for a minimum term of four years, thus endowing Santana with a property interest in the position. For this reason, the district court denied the defendants' motion to dismiss Santana's Fourteenth Amendment due process claims. Finally, the district court granted defendants' motion to dismiss Santana's claims of political discrimination against the Commonwealth officials personally on the basis of qualified immunity, but denied the defendants qualified immunity on Santana's due process claims.  The defendants' interlocutory appeal challenges this latter ruling.

## II.

"Qualified immunity specially protects public officials from the specter of damages liability for judgment calls made in a legally uncertain environment."  Ryder v. United States, 515 U.S. 177, 185 (1995).  The shield provided by the qualified immunity doctrine is "an immunity from suit rather than a mere defense to liability."  Saucier v. Katz, 533 U.S. 194, 200-01 (2001) (quoting Mitchell v. Forsyth, 472 U.S. 511, 526 (1985)) (emphasis in

-9-

original).  Thus, the defendants are entitled to challenge the district court's order denying qualified immunity on an interlocutory appeal, Mitchell, 472 U.S. at 530, at least "to the extent that the qualified immunity defense turns upon a 'purely legal' question."  Fletcher v. Town of Clinton, 196 F.3d 41, 45 (1st Cir. 1999).  In such an instance, we review the issue of qualified immunity de novo.  Suboh v. Dist. Attorney's Office, 298 F.3d 81, 90 (1st Cir. 2002).

## III.

The defendants are entitled to qualified immunity unless (1) the facts alleged show the defendants' conduct violated a constitutional right, and (2) the contours of this right are "clearly established" under then-existing law so that a reasonable officer would have known that his conduct was unlawful.  Dwan v. City of Boston, 329 F.3d 275, 278 (1st Cir. 2003) (citing Saucier 533 U.S. at 201).  Saucier instructs that the reviewing court should begin with the former question.  "A court required to rule upon the qualified immunity issue must consider, then, this threshold question:  Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?  This must be the initial inquiry."  Saucier at 201.  Thus, we approach the qualified immunity inquiry sequentially.

**A. Did the conduct alleged violate Santana's constitutional right?**

Santana asserts that the defendants violated her Fourteenth Amendment right to due process when they terminated her employment without affording her a pre-termination hearing. This claim rests on the proposition that Santana possessed a property interest in her employment as Executive Director of the HRODC. Under the Fourteenth Amendment, a state is prohibited from discharging a public employee who possesses a property interest in continued employment without due process of law. Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 538 (1985) (holding that a public employee classified as a "civil servant" under Ohio law has a property interest in continued employment, of which the State cannot deprive him without due process). However, the Constitution does not create property interests; instead, "they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law." Bd. of Regents of State Coll. v. Roth, 408 U.S. 564, 577 (1972); see also Ortiz-Piñero v. Rivera-Arroyo, 84 F.3d 7, 17 (1st Cir. 1996). In order to establish a constitutionally-protected property interest, a plaintiff must demonstrate that she has a legally recognized expectation that she will retain her position. A legitimate expectation of continued employment may derive from a statute, a contract provision, or an officially sanctioned rule of the workplace. Perry v. Sindermann, 408 U.S. 593, 601-02 (1972).

-11-

Santana's expectation of continued employment is constrained by two sources: the enabling statute creating the position of Executive Director of the HRODC, and the Governor's power of removal under the Constitution of Puerto Rico. We address these in turn.

### 1. The Enabling Statute

The position of Executive Director of the HRODC is statutorily created. The relevant statute provides:

> The Governor shall appoint an Executive Director with the advice and consent of the Senate for a term of four (4) years <u>and</u> until his/her successor is appointed and takes office, who shall direct the administrative and operating functions of the Council.

18 P.R. Laws Ann. § 1584 (emphasis added). The district court compared this language of the statute with the language describing the appointment of some of the members of the HRODC. Section 1584 goes on to provide that certain members of the Council "shall be appointed for a term of five (5) years each and shall hold office until the expiration of their respective appointments, <u>or</u> until their successors are appointed and take office." <u>Id.</u> (emphasis added). The district court ascribed great significance to the use of the word "or" in the description of the Council members appointments, versus the use of the word "and" in the description of the Executive Director's appointment. The district court reasoned:

> [T]he board members are appointed to a term that will last for five years <u>or</u> until someone has been appointed to and subsequently does

-12-

> actually replace them. Therefore the word "or" signifies that this position can be held for a term <u>no longer than</u> five years and potentially <u>shorter</u> dependant upon the Governor's desire. The Executive Director, however, is appointed to a term that will last for four years <u>and</u> until someone has been appointed to and subsequently does actually replace him or her. Therefor, [sic] the word "and" signifies that this position will be held for a term of <u>at least</u> four years if not <u>longer</u>, dependant upon the Governor's desire.

<u>Santana</u>, No. 01-1576, slip op. at 29 (emphasis in original). Based on the difference between "and" and "or," the district court determined that the Executive Director was to serve for a minimum of four years. The district court found support for this statutory interpretation in its prior determination, in the context of the political discrimination claim, that the council members of the HRODC are engaged in shaping public policy whereas the Executive Director is merely an executive and administrative position. Thus, as political positions, the council members would be removable before the conclusion of their term of appointment, whereas the Executive Director is guaranteed a term of four years. Relying on its own decision in <u>Quiles Rodriquez</u> v. <u>Calderón</u>, 172 F.Supp.2d 334, 342 (D.P.R. 2001),[7] the district court determined that "the

---

[7] In <u>Quiles</u> the district court held that the Chair of the Public Service Commission, an employee appointed by the Governor to a term position, cannot be terminated at the will of the Governor before the end of his term. The relevant statute in <u>Quiles</u> provides that "the Commissioners first appointed [by the Governor] shall hold office for terms of two, three, and four years, respectively. The term for each one shall be fixed by the Governor, but their successors shall be appointed for a term of

-13-

Governor did not have the automatic right to remove someone from a term position absent a clear delegation of removal authority stated explicitly in the statute." Santana, No. 01-1576, slip op. at 31 (citing Quiles, 172 F.Supp.2d at 343). Therefore, the court concluded that Santana had a property interest in her continued employment for the duration of the four-year term.

The district court's interpretation of the statute draws large conclusions from a subtle deviation in the statute's language. We question whether these subtleties can bear such weight. The Governor of Puerto Rico has a general power of removal that is statutorily derived. "The Governor shall have power to remove any officer whom he may appoint, except officers whose removal is otherwise provided for by the Constitution, and he may declare the office vacant and fill the same in the manner provided by law." 3 P.R. Laws Ann. § 6 (2002). The language "in the manner provided by law" indicates that the legislature may specify how an officer appointed by the Governor is to be removed. However, this language seems to contemplate an explicit statutory statement from the legislature on this issue. If the legislature is going to circumscribe the Governor's general power of removal, it arguably must do so with greater clarity and explicitness than the language

---

four years." Quiles, 172 F.Supp.2d at 339-40. It is important for the "clearly established" prong of the qualified immunity analysis to note that Quiles was decided on November 7, 2001, after Santana's dismissal from her job in this case.

found in the statute providing for the appointment of the Executive Director of the HRODC.

In fact, there are many examples of the legislature speaking with clarity to limit the Governor's power of removal in the context of other statutorily-created positions involving gubernatorial appointments. See, e.g. 23 P.R. Laws Ann. § 62e (2002) ("The Governor may remove any member [of the Puerto Rico Planning Board] for good cause upon due notice and hearing."); 29 P.R. Laws Ann. § 64 (2002) ("The Governor may remove any member of the [Labor Relations] Board, upon notice and hearing, for negligence or malfeasance in the performance of his duties"); 1 P.R. Laws Ann. § 252 ("The Governor may remove any member of the Food and Nutrition Commission from office for negligence in the performance of his/her duties, conviction of a felony or misdemeanor that implies moral turpitude, and mental disability decreed by a court.").

Hence, solely as a matter of statutory interpretation, there are good reasons to question whether the Puerto Rico legislature provided Santana with a property interest in her job. However, even if we assumed that in drafting 18 P.R. Laws Ann. § 1584 the legislature intended to limit the Governor's power to remove the Executive Director at will, the issue of whether Santana has a constitutionally-protected property interest would not be resolved. At oral argument, Santana sensibly conceded that if the

Executive Director position is subject to the Governor's constitutional power of removal, the legislature's attempt to insulate the position from removal at the will of the Governor would offend the principle of separation of powers imbedded in the Puerto Rico constitution. Thus, we must consider the scope of the Governor's constitutional power of removal.

## 2. The Governor's Constitutional Power of Removal

The Governor's removal power is implicit in Article IV, § 4 of the Constitution of Puerto Rico.[8] However, the Puerto Rico Supreme Court has not yet spoken on the scope of the Governor's power of removal under the Constitution. Nonetheless, both parties posit that the Governor's power of removal is analogous to the President's power under federal law. In <u>Quiles Rodriquez</u>, the district court emphasized this analogy:

> [U]nder the Puerto Rico Constitution, the authority of the Governor to carry out appointments is analogous to that of the President of the United States. In addition, it is well established that the executive function of appointing functionaries was incorporated in to the Puerto Rican Constitution via federal statute, case law,

---

[8] Article IV, § 4 provides in relevant part:

The Governor shall execute the laws and cause them to be executed.

* * *

He shall appoint, in the manner prescribed by this Constitution or by law, all officers whose appointment he is authorized to make.

and doctrine, so it is not uncommon that the Court look to federal case law in its effort to interpret the law and the Constitution to resolve this debate.

Quiles Rodriquez, 172 F.Supp.2d at 342 (citing Opinion of the Secretary of Justice, Op. Sec. Just. No.3 of 1995; Op. Sec. Just. No.25 of 1967).  Thus, following the lead of the district court, we examine the executive power of removal under the United States Constitution.

Article II of the United States Constitution grants the President the power to nominate and, with the advice and consent of the Senate, to appoint officers of the United States.  U.S. Const. art. II, § 2, cl. 2.  Although the Constitution is silent as to the President's removal power, it is well-established that "in the absence of any specific provision to the contrary, the power of appointment to executive office carries with it, as a necessary incident, the power of removal."  Myers v. United States, 272 U.S. 52, 126 (1926).  This implicit constitutional power to remove executive officers derives from the President's obligation under Article II, § 3 to assure that the laws are faithfully executed. Id.

The scope of the President's power of removal developed in a trilogy of cases: (1) Myers, (2) Humphrey's Executor v. United States, 295 U.S. 602 (1935), and (3) Wiener v. United States, 357 U.S. 349 (1958).  The Supreme Court more recently refined its

-17-

jurisprudence on this issue in Morrison v. Olson, 487 U.S. 654 (1988).

In Myers, the Supreme Court considered the validity of a federal statute providing that postmasters could be removed by the President only "by and with the advice and consent of the Senate," but that until so removed, they could hold office for four years. Concluding that Congress could not limit the President's power to remove an executive official, the Court held that the statutory restrictions limiting the President's power to remove officers he had appointed were unconstitutional. Myers, 272 U.S. at 176 ("[T]he Tenure of Office Act of 1867, in so far as it attempted to prevent the President from removing executive officers who had been appointed by him by and with the advice and consent of the Senate, was invalid, and [] subsequent legislation of the same effect was equally so.")

The Court limited its expansive holding in Myers in Humphrey's Executor. In Humphrey's, the President removed Humphrey from his position as a member of the Federal Trade Commission (FTC) for political reasons, rather than for reasons provided for by the FTC Act. The FTC Act gave the members of the FTC a seven-year term and provided that the President could remove any commissioner for "inefficiency, neglect of duty, or malfeasance in office." Humphrey's 295 U.S. at 623. The Court examined the nature and functions of the FTC and determined that its duties were

-18-

predominantly quasi-judicial and quasi-legislative. The Court confined the President's absolute power of removal to purely executive officers and determined that Congress may limit the removal power of the President with respect to officers performing quasi-judicial or quasi-legislative functions. Id. at 624-28.

The Supreme Court further developed this distinction between purely executive officers and those that perform quasi-judicial or quasi-legislative functions in Wiener, a case involving the President's dismissal of a previous President's appointee to the War Claims Commission because the President wanted to replace him with his own appointee. The relevant statute provided that the Commissioner's term was to expire with the life of the Commission but was silent with regards to removal. Thus, the statute placed no express restriction on the President's removal power. However, the Supreme Court determined that "[t]he Commission was established as an adjudicating body with all the paraphernalia by which legal claims are put to the test of proof," Wiener, 357 U.S. at 354, and, because the Commission performed such a quasi-judicial function, that the President's removal of the Commissioner was invalid, id. at 356. As the Supreme Court put it:

> Judging the matter in all the nakedness in which it is presented, namely, the claim that the President could remove a member of an adjudicatory body like the War Claims Commission merely because he wanted his own appointees on such a Commission, we are compelled to conclude that no such power is given to the President directly by the

-19-

> Constitution, and none is impliedly conferred upon him by statute simply because Congress said nothing about it. The philosophy of Humphrey's Executor, in its explicit language as well as its implications, precludes such a claim.

Id.

The Supreme Court reevaluated the President's power of removal in Morrison v. Olson, while upholding the constitutionality of the Independent Counsel Act. The Act created an Independent Counsel to investigate and prosecute certain cases in which officials within the executive branch were involved, and provided that the Attorney General could only remove the Independent Counsel for cause. The Supreme Court stated that its removal jurisprudence is designed "to ensure that Congress does not interfere with the President's exercise of the 'executive power' and his constitutionally appointed duty to 'take care that the laws be faithfully executed' under Article II." Morrison, 487 U.S. at 689-90. The Court noted that, while the Humphrey's/Wiener test, based on an analysis of the functions served by the official, is still relevant, it is not determinative. "[T]he real question is whether the removal restrictions are of such a nature that they impede the President's ability to perform his constitutional duty, and the functions of the officials in question must be analyzed in that light." Id. at 691. Thus, under Morrison, "purely executive" officers are subject to the President's power to remove them at will if that removal power implicates the President's power to

-20-

perform his constitutional duty to assure that the laws are faithfully executed.

These Supreme Court cases suggest that the question of the Governor's power to remove the Executive Director at will distills to (a) whether the Executive Director of the HRODC is a purely executive position that (b) entails policymaking or administrative authority such that (c) the Governor's obligation to execute the laws would be hindered by her inability to control the occupant of the position.

Respectfully, the district court's various conclusions concerning the extent to which the position of Executive Director is a policymaking position point in different directions. First, in rejecting defendants' motion to dismiss the political discrimination claim on the ground that the Executive Director was a "political position," the district court concluded that "there can be little to no doubt that the HRODC helps shape Commonwealth policy. However, the Court cannot see, at this point in the litigation, how the position of Executive Director is a 'political' one." Santana, No. 01-1576, slip op. at 25-26. Subsequently, in granting the defendants qualified immunity from the political discrimination claim, the court stated that its conclusion that the position was not a "political" one

> does not mean that the position did not entail at least a "modicum of policy making," or provide the holder with access to confidential documents . . . . More importantly, the law is

-21-

> not so clearly established that someone in Defendants' position would not believe that the Executive Director's position was a "trust" or "political" position, thus evoking the protections of qualified immunity.

Id. at 38. By contrast, in denying qualified immunity on the due process claim, the court failed to similarly consider whether someone in defendants' positions would believe that the Executive Director's position was a "political" position subject to termination at the will of the Governor, and therefore not a constitutionally-protected property interest.

In terms of the Morrison test, the position of Executive Director of the HRODC seems purely executive in the sense that it involves no quasi-judicial or quasi-legislative functions. The HRODC is an agency of the Department of Labor and Human Resources, and the position of Executive Director was created to "direct the administrative and operating functions" of the HRODC. 18 P.R. Laws Ann. § 1584. The Executive Director is appointed by the Governor. It is not a "career" position under the Puerto Rico Public Service Personnel Act.[9] 3 P.R. Laws Ann. § 1301 (2002). Therefore, the Executive Director does not enjoy the statutory protections afforded to career civil servants. The Governor determines the Executive Director's remuneration.

---

[9] Career positions are those filled according to competition with other candidates for the position and performance on a civil service exam. The candidates are drawn from a formal registry of eligible candidates. 3 P.R. Laws Ann. § 1333 (2002).

As Executive Director, Santana received proposals from each of the fifteen regional boards of the "occupational and human resources development system" and reviewed each proposal to ensure that it complied with the Puerto Rico WIB's five-year State Plan for workforce investment. Once she reviewed a proposal she would submit it to the Puerto Rico WIB for approval. The Executive Director is also responsible for reviewing each regional board's application for funds and auditing the regional boards for accountability and compliance with federal and Commonwealth regulations. The Executive Director monitored technical assistance to regional boards, monitored various federal funds allocated to the Department of Education and the Family, and was responsible for training the regional boards on administrative and management issues in compliance with federal and Commonwealth regulations. Santana, No. 01-1576, slip op. at 3-4.

While many of these duties are primarily administrative, the control over allocation of substantial federal funds and the power to review the regional board's proposals for workplace investment involve policymaking on issues of fundamental concern to the Governor: economic development, job creation and job training. Moreover, the Executive Director's responsibility for the receipt, custody and disbursement of the federal funds pursuant to the WIA, and her duty to audit the regional boards for accountability and compliance with federal and Commonwealth regulations, make the

-23-

position important to the Governor's constitutional obligation to faithfully execute the laws in these areas of central concern.

Importantly, the statute establishing the Executive Director position is distinguishable from the statute at issue in Morrison. In Morrison, the statute establishing the Independent Counsel provided for termination for "good cause." As the Supreme Court noted:

> This is not a case in which the power to remove an executive official has been completely stripped from the President, thus providing no means for the President to ensure the "faithful execution" of the laws. Rather, because the independent counsel may be terminated for "good cause," the Executive, through the Attorney General, retains ample authority to assure that the counsel is competently performing his or her statutory responsibilities in a manner that comports with the provisions of the Act.

Morrison, 487 U.S. at 692. By contrast, if the statute establishing the Executive Director position is interpreted as guaranteeing a four-year term, the Governor's power to assure that the Executive Director is competently performing her responsibilities is severely impaired. Hence, on the limited record before us on interlocutory appeal, it appears that the position of Executive Director of the HRODC may fall within the Governor's constitutional power of removal under a Morrison-type analysis. However, this is only reasoning by analogy. Only the Supreme Court of Puerto Rico can provide the definitive answer on the Governor's constitutional power of removal. The critical

-24-

question here is whether our responsibility to decide the qualified immunity issue before us requires that we decide a federal constitutional right question that turns on an unsettled question of Puerto Rican constitutional law.

**B.  Was Santana's property right clearly established?**

The Supreme Court held in <u>Saucier</u> that "the requisites of a qualified immunity defense must be considered in proper sequence."  Thus, the threshold question of whether "the facts alleged show the [defendants'] conduct violated a constitutional right . . . must be the initial inquiry. . . . The next sequential step is to ask whether the right was clearly established." <u>Saucier</u>, 533 U.S. at 201.  The Supreme Court's "sequential rule" in <u>Saucier</u> reflects a concern that if courts do not decide the constitutional right in question, the law will never become clearly established and guidelines for official conduct will not develop.  However, in this case, any ruling by us on the constitutional right question would be premised on our best judgment about the application of the separation of powers doctrine in the Puerto Rico Constitution.  The property right at the core of the federal constitutional allegation is dependent on an unresolved issue of Commonwealth constitutional law that can only be resolved definitively by the Puerto Rico Supreme Court.  Thus, the sequential rule of <u>Saucier</u> may not contemplate a situation such as this.  <u>See</u> <u>Campiti</u> v. <u>Matesanz</u>, 333 F.3d 317, 321 (1st Cir. 2003)

("Only as a last resort should the circuit courts read Supreme Court decisions to create such mandatory priorities."); cf. Dirrane v. Brookline Police Dept., 315 F.3d 65, 69-70 (1st Cir. 2002) (noting that applying Saucier's sequential rule "is an uncomfortable exercise where, as here, the answer whether there was a violation may depend on a kaleidoscope of facts not yet fully developed. It may be that Saucier was not strictly intended to cover the latter case.").

Our primary responsibility in a case such as this is to see that the federal law of qualified immunity is properly applied without presuming to opine on sensitive matters of Commonwealth constitutional law in a case where it is unnecessary to disposition of the appeal, and in which our own prediction one way or the other would not alter our analysis of or decision upon the federal issue. The first step of the qualified immunity analysis -- whether Santana has alleged a constitutional violation -- turns on whether the Governor of Puerto Rico has the constitutional power to terminate her employment at will, despite the statute stipulating a four-year term for the position of Executive Director. Under other circumstances, we might choose to certify this issue to the Puerto Rico Supreme Court. At issue is a fundamental point of Commonwealth constitutional law on which there is no precedent. E.g. Wigginton v. Centracchio, 214 F.3d 1, 3-4 (1st Cir. 2000); see also Arizonans for Official English v. Arizona, 520 U.S. 43, 77

(1997) ("Through certification of novel or unsettled questions of state law for authoritative answers by a State's highest court, a federal court may save time, energy, and resources and help build a cooperative judicial federalism."). However, to certify at this stage of the case would cause undue delay in both the resolution of this interlocutory appeal and the progression of the case on the merits. Moreover, due to the nature of the qualified immunity analysis, such delay would be wholly unnecessary to the outcome of this interlocutory appeal. Regardless of the Puerto Rico Supreme Court's decision -- whether they determined that the Governor does or does not have the power to remove the Executive Director of the HRODC at will and, accordingly, whether Santana does or does not have a property interest in her job -- we would grant the defendants' qualified immunity on the ground that at the time that Santana was fired, the constitutional right in question was not clearly established and a reasonable government official could have believed that her conduct in firing Santana was lawful. Thus, the best way for us to reconcile our competing obligations of faithful application of the federal law of qualified immunity and respect for the primacy of the Supreme Court of Puerto Rico on issues arising under the Puerto Rico Constitution, is to focus on the second step of the qualified immunity analysis -- the clearly established question.

"[Q]ualified immunity operates 'to ensure that before they are subjected to suit, officers are on notice that their conduct is unlawful.'"  Hope v. Pelzer, 536 U.S. 730, 739 (2002) (quoting Saucier, 533 U.S. at 206).  We cannot conclude that the defendants had notice that their removal of the plaintiff from her position would violate clearly established law.  Given the purely executive nature of the Executive Director position, the position's limited policymaking function, and the Governor's general power of removal, it was reasonable for the defendants to believe that Santana did not have a property interest in continued employment and that her termination therefore was not subject to constitutional due process protection.  Therefore, the defendants are entitled to the protection of qualified immunity.[10]

## IV.

For the reasons stated, we reverse the district court's denial of qualified immunity on the ground that, at the time of the defendants' conduct, the property right at issue was not clearly

---

[10]  In the district court, Santana invoked a liberty interest as well as a property interest with her due process claim.  The district court declined to decide whether a liberty interest was involved or address any consequent qualified immunity issue with respect to it.  Instead, it explained that by sustaining the property based due process claim, it had "mooted" the liberty based version.  Neither side has seriously discussed the liberty based claim on this appeal and we do not address it.  To the extent that Santana desired to pursue such a claim on remand, the defendants are free to assert their qualified immunity defense and appeal if it is rejected; but we will not anticipate issues that have not been addressed by the district court or briefed by the parties.

established under the law of Puerto Rico.  Only the Supreme Court of Puerto Rico can definitively resolve this property right issue. Therefore, we urge the district court, as it proceeds with the suit for injunctive relief and the other claims against the defendants, to consult with the parties about the appropriateness of certifying to the Puerto Rico Supreme Court the Commonwealth constitutional issue relating to the removal power of the Governor.

The district court's order denying defendants qualified immunity on Santana's due process claim is **reversed**.

So ordered.