# United States Court of Appeals
## For the First Circuit

No. 14-2247

CARLOS D. HERNANDEZ-CUEVAS,

Plaintiff, Appellant,

v.

WILLIAM TAYLOR; STEVEN W. MARTZ,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Camille L. Vélez-Rivé, U.S. Magistrate Judge]

Before

Torruella, Lipez, and Thompson,
Circuit Judges.

Pedro R. Vázquez, III, with whom Jose F. Quetglas Jordan and Quetglas Law Offices were on brief, for appellant.
Leah Brownlee Taylor, Trial Attorney, with whom Benjamin C. Mizer, Principal Deputy Assistant Attorney General, Civil Division, Rosa Emilia Rodríguez-Vélez, United States Attorney, Rupa Bhattacharyya, Director, Torts Branch, Civil Division, and Lisa Bhatia, Assistant United States Attorney, were on brief, for appellees.

September 9, 2016

**LIPEZ**, **Circuit Judge**.  We revisit here appellant Carlos Hernandez-Cuevas's ("Hernandez") Fourth Amendment claim of malicious prosecution, actionable under Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics, 403 U.S. 388 (1971).[1] We first encountered Hernandez's case when defendants William Taylor and Steven Martz -- both FBI special agents ("SAs") -- brought an interlocutory appeal challenging the district court's denial of qualified immunity.  See Hernandez I, 723 F.3d at 96. We affirmed, concluding that the facts alleged in Hernandez's complaint, viewed in the light most favorable to him, stated a plausible claim that Taylor and Martz violated Hernandez's "Fourth Amendment right to be free from seizure but upon probable cause." Id. at 102, 105.  The case returned to the district court for trial.  After Hernandez presented his evidence, the court granted Taylor and Martz's motion for judgment as a matter of law and dismissed the case with prejudice.  We agree that a reasonable jury would not have a legally sufficient evidentiary basis to find for Hernandez, and we detect no other legal error in the district court's decision.  We therefore affirm.

---

[1] "A Bivens action is a civil action brought against agents of the United States . . . .  'This implied cause of action is the federal analog to § 1983 suits against state officials.'" Hernandez-Cuevas v. Taylor, 723 F.3d 91, 93 n.1 (1st Cir. 2013) ("Hernandez I") (quoting Soto-Torres v. Fraticelli, 654 F.3d 153, 158 (1st Cir. 2011)).

## A. Factual Background

In Hernandez I -- a challenge to the district court's denial of qualified immunity -- we recounted the facts as presented in Hernandez's complaint and the documents it incorporated. 723 F.3d at 94. Here, on appeal from the district court's judgment as a matter of law, we recount the facts based on "the evidence and reasonable inferences drawn from the evidence," in the light most favorable to Hernandez, the nonmoving party.[2] Malone v. Lockheed Martin Corp., 610 F.3d 16, 20 (1st Cir. 2010) (quoting Espada v. Lugo, 312 F.3d 1, 2 (1st Cir. 2002)); see also J.R. v. Gloria, 593 F.3d 73, 76 (1st Cir. 2010).

### 1. The Transaction

In 2003, the FBI began a multi-year investigation into an international drug and money laundering scheme that spanned New Jersey, New York, Puerto Rico, and Colombia. Agents from FBI San Juan and FBI Newark -- including SAs Taylor and Martz -- participated in the investigation, known as "Para Cash." Through the course of the investigation, SAs Taylor and Martz, along with SA Luis Rodriguez, worked with a confidential informant ("informant") to infiltrate the drug ring. SAs Taylor, Martz, and

---

[2] Specifically, we draw the facts from the parties' stipulations, the evidence presented at trial, and the joint appendix submitted by the parties on appeal.

Rodriguez met in person and spoke on the phone with the informant multiple times.

In July 2004, Rodriguez, Martz, and the informant traveled to Puerto Rico for an arranged pick-up of approximately $322,000 from an unknown courier. Taylor was not in Puerto Rico at the time of the scheduled exchange. On July 20, 2004, the informant met the courier at a supermarket parking lot in Isla Verde, Carolina. Throughout the transaction, Rodriguez and Martz were hidden from view, and SA Regino Chavez observed the transaction from a distance of "fifty or more meters away . . . without the aid of lenses, glasses or binoculars."

The unidentified courier arrived alone at the meeting, driving a gray Mitsubishi Montero. The courier and the informant, who was wearing a body wire, then had a conversation about the transaction but did not exchange the money. The courier drove away, and Rodriguez and Martz debriefed the informant, who informed the SAs that the courier said he would return in a half hour. About a half hour later, the courier returned, but this time he was the passenger in a white Jeep Cherokee,[3] driven by another

_____

[3] The driver of the Mitsubishi Montero and the passenger in the Jeep Cherokee are referred to as "UNSUB #1" and "UNSUB #3," respectively, in the FBI's surveillance report of the transaction. However, at trial, Taylor testified that the labels "UNSUB #1" and "UNSUB #3" referred to the same individual -- referred to herein as the "courier" -- and that he confirmed this based on the recorded conversation obtained from the informant's body wire. Martz also testified that the courier from the first vehicle was

unidentified individual ("the driver"). The Cherokee pulled up alongside the informant's car so that the passenger window of the Cherokee was next to the driver's side of the informant's car. After the courier and the informant spoke from their cars, the courier and the driver of the Cherokee got out of their vehicle and at least one of them placed two bags of money in the trunk of the informant's car. The driver and courier then returned to their vehicle and drove away.

FBI surveillance agents followed the Jeep Cherokee and saw the courier exit the car at 1655 Santa Ana Street and walk into the porch area of the residence. The courier was not arrested at that time. The Cherokee then continued onto a highway, after which a marked unit of the Puerto Rico Police Department conducted a traffic stop of the Cherokee, but the officers did not arrest the driver.

### 2. Post-Transaction Reports and Surveillance

Martz testified that he debriefed the informant following the transaction and took handwritten notes of the exchange on July 20, 2004 -- the day of the transaction. The informant described the courier as "thirty-nine to forty-one (39-41) [years old], black, . . . [with a] big stomach, fat, wearing a blue shirt," and "Puerto Rican." In Martz's typed FBI report,

---

the same individual as the passenger in the second vehicle. Hernandez offered no evidence to rebut this testimony.

- 5 -

which was transcribed on August 10, the courier is described as "a fat, dark skin, Puerto Rican male with a big stomach, approximately 39-41 years of age, 5'10" tall wearing a light blue shirt." Based on his surveillance of the transaction, SA Chavez also filed an FBI report that was dictated on July 30 -- ten days after the transaction -- and transcribed on August 1. SA Chavez's surveillance report described the courier as "[m]ale," "[b]lack," "5'7"," "[h]eavy," in his "[l]ate [f]ifties," and wearing a "[b]lue shirt and brown pants."

Nearly six months later, at the request of FBI Newark, FBI San Juan conducted "spot check" surveillance of 1655 Santa Ana Street -- the residence where the driver dropped off the courier -- to identify residents of the address. According to the FBI report completed by SA Madeline Albrecht on February 22, 2005, vehicle registration information and/or utilities checks linked five individuals to the address.[4] Hernandez, whose gray Infiniti was parked in front of the residence and registered to its address, was the only male identified in SA Albrecht's report. Hernandez's car was not connected to the July 20 transaction.

On March 2, 2005, FBI Newark requested that FBI San Juan obtain a photograph of Hernandez and additional information about

_____

[4] Hernandez testified that the dwelling was "divided into some seven (7) or eight (8) rooms and those rooms would be rented separately to different persons."

him.  The Department of Motor Vehicles ("DMV") provided a photo of Hernandez from the shoulders up and a description of him as male, 5'11", 40 years of age, 185 pounds, and a "medio marrón" complexion.  For reader ease, the multiple FBI-recorded descriptions of the courier and the DMV description of Hernandez are provided in the chart below.

| SA Martz - informant debrief, July 20, 2004 | SA Martz - FBI Report, transcribed August 10, 2004 | SA Chavez - FBI Report, dictated July 30, 2004, transcribed August 1, 2004 | DMV-provided description of Hernandez |
|---|---|---|---|
| | Male | Male | Male |
| Black | Black | Dark Skin | "[M]edio marrón" |
| Puerto Rican | Puerto Rican | | |
| Heavy set; big stomach | Fat; big stomach | Heavy | 185 pounds |
| ~39-41 years old | Approximately 39-41 years old | Late Fifties | 40 years old |
| | 5'10" | 5'7" | 5'11" |
| Blue shirt | Wearing a light blue shirt | Wearing a blue shirt and brown pants | |

### 3.  The Photographic Array

After receiving the photograph and DMV description of Hernandez, SA Martz gave the photo to FBI Newark's photo lab specialists to assemble a photographic array.  Martz testified that he emailed the photo array to the informant, who was in Colombia at the time, on May 25, 2005 -- nearly ten months after the transaction took place.  Martz and Taylor spoke with the informant over the phone the day after emailing him the photo

array. When asked at trial who was physically with the informant during the identification, both Taylor and Martz testified that they believed him to be alone.

Over the phone, the informant identified the photo of Hernandez as the courier. Martz recalled asking the informant "if he was sure, and he said he was positive." Martz asked the informant "why he was positive and he said because he had met the individual twice" on the day of the transaction -- once when the courier came in the Mitsubishi Montero and the second time when he came in the Jeep Cherokee. In his handwritten notes detailing the call, Martz wrote that the informant was "very sure[,] positive[,] . . . saw 2x."

**4.    The Government's Arrest, Detainment & Release of Hernandez**

On the day the informant identified Hernandez as the courier, Taylor ran a background check on Hernandez that "showed there was no prior criminal record" linked to him. That same day, Taylor drafted an FBI report, which named Carlos D. Hernandez Cuevas as a courier in the Para Cash transaction.

Subsequently, Taylor assembled the materials relating to the investigation, including recordings and transcripts, and sent the information to the U.S. Attorney's Office in Newark, New

Jersey.[5]  Assistant U.S. Attorney ("AUSA") Robert Frazer was assigned to prosecute cases arising out of the Para Cash investigation.  The parties stipulated that "the decision to charge Hern[a]ndez with criminal activity was made exclusively by the Newark, New Jersey U.S. Attorney's Office."

In support of the criminal complaint filed against Hernandez, AUSA Frazer drafted an affidavit, which SA Taylor then signed.  In the affidavit, Taylor attested that "[o]n or about July 20, 2004, in Puerto Rico, defendant CARLOS HERNANDEZ CUEVAS . . . delivered approximately $321,956 in United States currency, which was the proceeds of narcotics trafficking, to [the informant]."  To corroborate his identification of Hernandez as the courier, Taylor testified that he considered SA Chavez's surveillance report, as well as the body wire transcripts, the debriefing of the informant, and the spot surveillance of the residence at 1655 Santa Ana Street, among other things.

AUSA Frazer filed a complaint and warrant request -- with Taylor's affidavit attached -- for Hernandez's arrest, and a magistrate judge issued the warrant.  Pursuant to the warrant, the FBI arrested Hernandez at his home on December 3, 2007.  On December 6, Hernandez appeared before a federal magistrate judge in Puerto Rico.  At that point, Hernandez's lawyer presented to

---

[5] Martz's involvement in Para Cash ceased by September 2005; Taylor, however, remained assigned to the investigation.

the court Hernandez's passport, "to show his presence in the Dominican Republic around the time period of the transaction." Nevertheless, Hernandez was not granted bail or released.

Following his arrest, Hernandez was held in "federal jail" in Puerto Rico for over two months, and then transferred to a facility in Miami for two or three days, to a facility in Oklahoma for one day, and finally to a facility in New Jersey for his court appearance in the District of New Jersey on February 29, 2008. At the court appearance, AUSA Frazer asked that Hernandez be released because the government "need[ed] to do some more investigation to confirm what . . . is a serious doubt as to . . . the correct identity of the perpetrator in this case." The court agreed on the condition that Hernandez surrender his passport. Later that day, Hernandez was released on his own recognizance. Two months later, the U.S. Attorney for the District of New Jersey dismissed the complaint against Hernandez.

**5. Hernandez's Background & Whereabouts in July 2004**

Hernandez, who was born in the Dominican Republic, moved to Puerto Rico in 1992 to take a course organized for track and field trainers by the International Olympic Committee. When he moved to Puerto Rico, he also was an athlete member of the Dominican Republic's National Team. After holding jobs in the construction and restaurant industries, he was appointed vice president of the Track and Field Dominican Federation abroad as

well as Sports Director for the Dominican Republic, serving from the country's consulate in Puerto Rico.

According to Hernandez, by 2004, he was working on a television program called "Evening Express." On July 8, 2004, twelve days before the Para Cash transaction, Hernandez traveled by ferry to the Dominican Republic to cover a Central American basketball tournament for Evening Express and for the Central American Games. He also had been selected as a delegate for the Dominican Republic at the 2004 Olympic Games in Athens, Greece. Hernandez testified that he was in the Dominican Republic on July 20, 2004 -- the date on which the Para Cash transaction took place in Puerto Rico -- and that he left on August 13, 2004, when he flew to Greece.[6]

## B. Hernandez I

Hernandez filed suit against Martz and Taylor on March 2, 2009, alleging that they were responsible for his being held in federal custody for three months without probable cause. Hernandez I, 723 F.3d at 95-96. Taylor and Martz filed a motion to dismiss the claims against them, arguing that they were entitled

---

[6] Over defendants' objection, the district court admitted Hernandez's passport into evidence, "subject to the translation being submitted properly." On appeal, defendants argue that "the passport was not translated until this appeal and is untimely." However, we need not consider the admissibility of Hernandez's passport because we recite above Hernandez's testimony, presented in the light most favorable to him.

to qualified immunity.  Id. at 96.  The district court denied the motion, Taylor and Martz filed an interlocutory appeal, and we affirmed the district court's judgment.  Id. at 93, 96.

In affirming the denial of qualified immunity, we concluded "that the Fourth Amendment protection against seizure but upon probable cause does not end when an arrestee becomes held pursuant to legal process."[7]  Id. at 99-100.  Prior to Hernandez I, our circuit had not explicitly recognized a Fourth Amendment protection that extends beyond unlawful arrest to hold law enforcement officials accountable for malicious prosecution.  Id. at 97.  Ordinarily, "the neutral magistrate's determination that probable cause exists for the individual's arrest is an intervening act that could disrupt any argument that the defendant officer had caused the continued unlawful seizure."  Id. at 100.  In order to "overcome this causation problem" and show that law enforcement officers had effected a malicious prosecution, we held that the

---

[7] When analyzing an appeal from a denial of qualified immunity, we consider whether "(1) the facts alleged show the defendants' conduct violated a constitutional right, and (2) the contours of this right are 'clearly established' under then-existing law so that a reasonable officer would have known that his conduct was unlawful."  Hernandez I, 723 F.3d at 97 (quoting Santana v. Calderón, 342 F.3d 18, 23 (1st Cir. 2003)).  However, in Hernandez I, the appellees declined to address the "clearly established" prong of the qualified immunity analysis.  Id.  We therefore limited our analysis to whether Hernandez's claim fails under the first prong.  Id.

- 12 -

plaintiff had to demonstrate that the officers "were responsible for his continued, unreasonable pretrial detention."  Id.

Further, we found that, to succeed, a Bivens action claiming malicious prosecution in violation of the Fourth Amendment must establish the elements of a purely constitutional claim rather than the elements of a blended constitutional/common law claim, which requires a separate showing of subjective malice. Id. at 99-100.  However, we noted that although "we adopt[ed] a purely constitutional rather than a blended constitutional/common law approach, we believe that the practical consequences of this choice are less significant than they initially appear."  Id. at 101.

We reached this conclusion based on the Supreme Court's decision in Franks v. Delaware, which examined whether a criminal defendant may "challenge the truthfulness of factual statements made in an affidavit supporting [a] warrant."  438 U.S. 154, 155 (1978).  The Court held that, under the Fourth Amendment, items discovered pursuant to a search warrant may be suppressed if the defendant can show that law enforcement officers deliberately or recklessly included in the affidavit false statements that were necessary to the finding of probable cause.  Id. at 155-56. Applying this rule in the civil context of a Fourth Amendment malicious prosecution claim, we concluded that the standard announced in Franks -- requiring the plaintiff to demonstrate that

- 13 -

statements by law enforcement officers "amounted to 'deliberate falsehood or . . . reckless disregard for the truth,'" Hernandez I, 723 F.3d at 102 (quoting Franks, 438 U.S. at 171) -- described "reprehensible behavior [that] seems indistinguishable from the common law element of malice," id.  In other words, a plaintiff pursuing a Fourth Amendment malicious prosecution claim must demonstrate that "[law enforcement] officers formulated evidence essential to the probable cause determination with a mental state similar to common law malice."  Id. at 101.

Having recognized a cognizable legal claim and what plaintiffs must demonstrate to establish it, we reviewed Hernandez's complaint and determined that he had alleged a plausible claim that Taylor and Martz caused him to be held in federal custody without probable cause.  Id. at 105.  We thus remanded the case to the district court for further proceedings.

## C.  Post-Hernandez I District Court Proceedings

In district court, the parties began discovery, and Martz and Taylor moved for summary judgment.  The magistrate judge denied the defendants' motion, and the case went to trial.[8]  After the testimony of only three witnesses -- Hernandez, Martz, and Taylor -- Hernandez rested his case.  The defendants then moved for judgment as a matter of law, under Federal Rule of Civil

---

[8] Both parties consented to have a magistrate judge conduct proceedings and enter judgment in this case.

- 14 -

Procedure 50(a). A court may grant a motion for judgement as a matter of law "[i]f a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." Fed. R. Civ. P. 50(a)(1).

The magistrate judge granted the motion, concluding that "Plaintiff Hern[a]ndez-Cuevas ha[d] failed to prove that Defendants Taylor and Martz caused a seizure of [Hernandez] pursuant to a legal process unsupported by probable cause." Concerning the first element of a malicious prosecution claim, causation, the magistrate judge found that Hernandez had not presented any evidence to prove that Taylor and Martz "tainted or arranged" the photo array presented to the informant or that Taylor made statements in his affidavit that "amounted to 'deliberate falsehood or reckless disregard for the truth.'" (quoting Franks, 438 U.S. at 171). The magistrate judge also addressed the civil conspiracy alleged in Hernandez's complaint and concluded that "[n]o evidence was presented of an agreement between agents Taylor and Martz to inflict a wrong against or injury upon [Hernandez]." Hernandez's timely appeal followed.

## II.

We review de novo a district court's grant of a Rule 50(a) motion for judgment as a matter of law, taking the evidence in the light most favorable to the nonmovant. See Cham v. Station

- 15 -

Operators, Inc., 685 F.3d 87, 93 (1st Cir. 2012). We review evidentiary rulings for abuse of discretion if the objecting party has preserved the issue. United States v. Peña-Santo, 809 F.3d 686, 694 (1st Cir. 2015).

## A. Fourth Amendment Malicious Prosecution Claim

Hernandez argues that he provided sufficient evidence for a reasonable jury to conclude that he established malicious prosecution in violation of the Fourth Amendment. In order to establish such a violation, Hernandez had to demonstrate that Taylor and Martz "(1) caused (2) a seizure of [Hernandez] pursuant to legal process unsupported by probable cause, and (3) criminal proceedings terminated in [Hernandez's] favor." Hernandez I, 723 F.3d at 101 (quoting Evans v. Chalmers, 703 F.3d 636, 647 (4th Cir. 2012)).

To satisfy the first element, causation, Hernandez was required to "demonstrate that law enforcement officers were responsible for his continued, unreasonable pretrial detention." Id. at 100. Such responsibility may be established by showing that the officers "ma[d]e, influence[d], or participate[d] in the decision to prosecute," Sykes v. Anderson, 625 F.3d 294, 311 (6th Cir. 2010) (quoting Fox v. DeSoto, 489 F.3d 227, 237 (6th Cir. 2007)) (alterations in original), by, for example, "(1) 'l[ying] to or misle[ading] the prosecutors'; (2) 'fail[ing] to disclose exculpatory evidence'; or (3) 'unduly pressur[ing] the prosecutor

- 16 -

to seek the indictment,'" Hernandez I, 723 F.3d at 100 (quoting Evans, 703 F.3d at 647-48). Thus, when establishing causation, the plaintiff must demonstrate that the actions or statements of law enforcement officers "amounted to 'deliberate falsehood or . . . reckless disregard for the truth.'" Hernandez I, 723 F.3d at 102 (quoting Franks, 438 U.S. at 171).

Hernandez argues on appeal that the photo array "created at the direction of Martz," and "Taylor's fabricated testimony" in his affidavit, provided "sufficient evidence . . . to indicate that Defendants made representations that amounted to deliberate falsehoods or reckless disregard for the truth," and thus caused his seizure without probable cause. We take these two allegations of wrongdoing in turn.

### 1. The Photographic Array

As the parties stipulated before trial, Martz provided the DMV photo of Hernandez to FBI Newark's photo lab, and, "[c]onsistent with FBI policy, the FBI lab created a photo array which contained Hernandez's photograph, along with five other similar looking individuals." In Hernandez I, we concluded that

> [a]lthough the complaint does not specify how
> the co-conspirators tainted the photo array,
> Hernandez-Cuevas has pled sufficient facts to
> support a reasonable inference that something
> was amiss. Specifically, Hernandez-Cuevas has
> alleged that rather than selecting a
> photograph of someone matching the description
> of [the courier] -- short, stocky, and nearly
> sixty -- [the informant] picked a photograph

- 17 -

of Hernandez-Cuevas, who was tall, thin, and only forty.

723 F.3d at 104.

At trial, however, Hernandez did not present any evidence to support the allegation that the array was tainted. To the contrary, as we now know, SA Chavez's surveillance report -- which describes the courier as "short, stocky, and nearly sixty," and does not closely resemble Hernandez, id. -- was not the only available description of the courier. The record established that the DMV description of Hernandez as forty years old, 5'11", of "medio marrón" complexion, and 185 pounds, matched, at least in part, the informant's description of the courier as approximately forty years old, 5'10",[9] black, and having a big stomach. As the parties stipulated before trial, "FBI agents routinely rely on descriptions provided by witnesses, including [confidential informants], who have face to face interactions with the subject of investigation, given their opportunity to observe the physical characteristics of the subjects."

Furthermore, the courier was last seen at 1655 Santa Ana Street, and SA Albrecht's report identified Hernandez as the only

---

[9] We note that the courier's height was included in the August 10 FBI report but not in the informant's description of the courier on July 20 -- the date of the transaction. However, the absence of the courier's height from the initial description does not, without more, support an inference that the height was fabricated in the August 10 report.

male officially associated with that address. After receiving the DMV description and the photo of Hernandez from FBI San Juan, Martz testified that he "believed we had enough evidence, based on the investigation." Hernandez presented no evidence at trial to rebut this testimony, to establish that Martz tainted the photo array, or to establish that Martz and Taylor worked in concert with the informant to identify Hernandez.

### 2. Taylor's Affidavit

As for proving that Taylor "either knowingly or with reckless disregard for the truth made [false] sworn statements in a warrant affidavit" that Hernandez was the courier, Hernandez's case again fails. Hernandez I, 723 F.3d at 104. When initially questioned by Hernandez's counsel at trial, Taylor testified that he "gave consideration to" SA Chavez's surveillance report describing the courier as in his late fifties, 5'7", and heavy, but that he also looked to "the body wire [recording], the debriefing of the [informant]," as well as "the utilities check, [and] the other spot surveillance" to corroborate the statement made in his affidavit identifying Hernandez as the courier.

When cross-examined by his own attorney, Taylor stated that he believed that the description of the courier provided by the informant "matched remarkably accurately" the DMV description of Hernandez. Taylor testified that his statement in his affidavit as to his knowledge of the facts of the investigation was "[o]ne

- 19 -

hundred percent" truthful. On re-direct, Hernandez's attorney questioned Taylor about the August 10 transcription date of Martz's FBI report (detailing the informant's description of the courier) and whether Taylor was in Puerto Rico on the date of the transaction.[10] Neither line of questioning, however, undermined his previous testimony or provided a sufficient basis for a jury to conclude that Taylor deliberately or recklessly included false statements in his affidavit.

In light of Taylor's unrebutted testimony, Hernandez did not establish "a legally sufficient evidentiary basis," Fed. R. Civ. P. 50(a), for a reasonable jury to conclude that Taylor "made statements in the warrant affidavit which amounted to 'deliberate falsehood or . . . reckless disregard for the truth.'" Hernandez I, 723 F.3d at 102 (quoting Franks, 438 U.S. at 171) (omission in original).

In sum, although we concluded in Hernandez I that Hernandez's complaint provided sufficiently plausible allegations to make out a malicious prosecution Bivens claim, 723 F.3d 102–05, the evidence that Hernandez presented at trial did not bear out his original allegations with respect to either Martz or Taylor. To the contrary, the limited evidence presented at trial revealed that the confluence of matching physical features and

---

[10] The parties stipulated before trial that Taylor was not in Puerto Rico on the date of the transaction.

residence led the agents to Hernandez.  Hence, the record is insufficient to permit the jury to conclude "that law enforcement officers were responsible for [Hernandez's] continued, unreasonable pretrial detention," as required by the causation element of a Fourth Amendment malicious prosecution claim.  Id. at 100.  Hence, we need not examine the remaining two elements of Hernandez's claim.[11]

## B.  The Reckless Disregard Standard

Hernandez also argues that the magistrate judge did not correctly apply the intent standard that we announced in Hernandez I.  The magistrate judge found that "the evidence does not support the claims that agent Taylor made statements in the affidavit, in support of the complaint and arrest warrant against Plaintiff Hern[a]ndez-Cuevas, which amounted to 'deliberate falsehood or reckless disregard for the truth'" (quoting Franks,

---

[11] Hernandez's civil conspiracy claim also fails.  As the magistrate judge noted in her order, Hernandez alleged a civil conspiracy "in the complaint but not as a separate cause of action."  We have stated that, "[i]n order to make out an actionable conspiracy . . . a plaintiff has to prove not only a conspiratorial agreement but also an actual abridgment of some federally-secured right."  Nieves v. McSweeney, 241 F.3d 46, 53 (1st Cir. 2001) (emphasis added).  Hernandez did not present even circumstantial evidence that Martz and Taylor entered into a conspiratorial agreement.  See Earle v. Benoit, 850 F.2d 836, 845 (1st Cir. 1988) (finding error in the district court's directed verdict where "there was sufficient circumstantial evidence . . . for a reasonable jury to have inferred a conspiracy").  Moreover, as we just concluded, he failed to establish a violation of his "Fourth Amendment right to be free from malicious prosecution."  Hernandez I, 723 F.3d at 99.

438 U.S. at 171). Hernandez argues that the magistrate judge "injected into the analysis 'malice' which generally denotes subjective criteria," and therefore did not follow the law of the case doctrine, which "posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." Arizona v. California, 460 U.S. 605, 618 (1983). We disagree. Simply put, the magistrate judge accurately quoted language from Hernandez I and Franks, and she properly assessed the requisite mental state.

## C. Evidentiary Rulings

Hernandez argues that the magistrate judge erred when she precluded him from using the defendants' documentary evidence. The magistrate judge's pretrial procedure order required that "[a]ll exhibits shall be pre-marked and exchanged prior to trial. It shall be the responsibility of counsel, at least three (3) working days prior to the trial, to make appropriate arrangements with the courtroom deputy clerk in this respect." At multiple points during the trial, the magistrate judge did not allow documents into evidence that Hernandez did not list as exhibits for trial, in accordance with the pretrial order. The magistrate judge emphasized that Hernandez's failure to include the documents

in the list of exhibits to be introduced at trial was "not a technicality."

"[A] district court has broad discretion to preserve the integrity of a pretrial order," and "an appellate court generally should not interfere with a trial court's decision to admit or exclude evidence based on its interpretation of its own pretrial order." Alberty-Veléz v. Corporación De Puerto Rico Para La Difusión Pública, 242 F.3d 418, 423 (1st Cir. 2001). On appeal, Hernandez does not identify the specific documents that the magistrate judge excluded or how the magistrate judge's ruling prejudiced him at trial. He provides only a few scant citations to the trial transcript, leaving us to discern the documents excluded and the effect of their exclusion. Without more from Hernandez, we have no justification to disturb the magistrate judge's enforcement of her own pretrial order.[12] Moreover, even if the magistrate judge had erred, the one excluded document that we can discern from Hernandez's trial transcript citations -- Martz's handwritten notes of the informant's debriefing -- only serves to further undermine Hernandez's case. Hence, even assuming error on the magistrate judge's part, such error would be harmless.

_____

[12] Hernandez asserts that the judge precluded the evidence in spite of the parties' agreement under the joint proposed pretrial order to "use evidence announced by the other party upon good cause shown." Hernandez, however, has not argued that he provided a showing of good cause to the magistrate judge, nor has he offered such a showing on appeal.

**<u>Affirmed.</u>**